## CONDER v. UNIVERSITY OF UTAH et al.

No. 7863.   Decided April 22, 1953.   (257 P. 2d 367.)

See 14 C. J. S., Colleges and Universities, sec. 14. Land grants and appropriations. 55 Am. Jur., Universities and Colleges, sec. 26; 67 A. L. R. 1032.

*Arthur H. Nielsen,* Salt Lake City, for plaintiff.

*Clinton D. Vernon,* Atty. Gen., *Allen B. Sorensen,* Asst. Atty. Gen. (*William H. Leary,* Salt Lake City, of counsel), for defendants.

WADE, Justice.

This proceeding was brought to restrain the University of Utah acting through its Board of Regents from entering into a loan agreement with the United States Government to finance the building of two dormitories for men. The

agreement which the University proposes to enter into would provide for the sale by it to the United States Government of about $1,000,000 in revenue bonds. These bonds are to be secured by a first and exclusive lien upon the net revenue and income which will be derived from the operation of the dormitory buildings and also by a first and exclusive lien on the interest and income to which the University is entitled from the Federal Land Grants described in Sec. 5, Art. X, Constitution of Utah and known as the Land Grant Funds.

The University proposes to enter into this loan agreement under authority of Chap. 126, Laws of Utah 1947 which under Sec. 2, provides that to pay for the buildings the Board of Regents of the University

"is authorized to borrow money on the credit of the income and revenues to be derived from the operation of the building, and on the imposition of student building fees or both, or from other sources other than by appropriations by the Legislature of the State of Utah * * *."

It is plaintiff's contention that if the University is permitted under the above statute to pledge its income from the Land Grant Funds as well as the income to be derived solely from the operation of the buildings sought to be constructed, then the act is unconstitutional because it will allow the University to enter into an agreement whereby a debt will be created against the state within the meaning and provisions of Sec. 2, Art. XIII and Sec. 1, Art. XIV, Constitution of Utah.

The plaintiff concedes that under our holding in *Spence* v. *Utah State Agricultural College,* Utah, 225 P.2d 18, had the University of Utah proposed to pledge funds derived solely from revenues to be obtained from the operation of the project sought to be constructed or from funds derived from students, then such a loan would not constitute a debt within the meaning of the above constitutional prohibitions. However, plaintiff contends that if

Chap. 126 allows the University to pledge the income and interest from the Land Grant Funds to which it is entitled as well as student fees or revenues to be derived solely from the proposed project, then the Act violates the above constitutional provisions because it would allow the University to contract a general obligation for which the state would be liable and would be outside "the special fund doctrine" as announced by this court in the past.

For a full discussion of "the special fund doctrine" as enunciated by this court in earlier cases, the reader is referred to *Spence* v. *Utah State Agricultural College,* supra. In that case it was sought to restrain the Agricultural College from entering into a loan agreement with the United States Government under the authority given it by Chap. 126, Laws of Utah 1947. The College proposed to build a student Union Building with money to be borrowed from the United States Government. The loan was to be secured by bonds pledging the revenues to be derived from the operation of the student Union Building and from student fees. This court in holding that the bonds which were proposed to be issued would not create a debt against the State of Utah which would be in violation of Sec. 2, Art. XIII and Sec. 1, Art. XIV, Constitution of Utah, pointed out that in conformity with the Act the bonds would show on their face that neither the State, the College nor the Board of Trustees would be liable for their payment and that the holders of the bonds could only look for payment from revenues to be derived solely from the operation of the building and from student fees. The bonds would not require the State to make or guarantee any of the payments should there be insufficient revenues from the sources pledged and payments could only be made from those special funds.

The question to be determined in the instant case is whether pledging the income and interest of the State Land Funds to which the University is entitled in addition to the revenues to be derived from the operation of the build-

ings would make the loan a debt which would have to be paid by the State and thereby come in conflict with the constitutional provision on debt limits.

It is plaintiff's contention that under the "restricted special fund theory" which this court has followed in the past, the pledging of the interest and income of the State Land Funds was prohibited by the Constitutional provisions because it pledged funds other than that to be derived solely from the operation of the buildings. The "restricted special fund theory" is based on the reasoning that if any funds of the borrower other than that derived from the project for which the loan is made, is diverted to pay this loan, then the amount which is so paid out will not be available for other needs of the borrower and the funds for such needs will have to be augumented by general taxation. This was the reasoning in *Fjeldsted* v. *Ogden City*; 83 Utah 278, 28 P.2d 144. See also *Wadsworth* v. *Santaquin City*, 83 Utah 321, 28 P.2d 161. Plaintiff concedes that the Fjeldsted case, (and the same would apply to the Wadsworth case) in which this court adopted the "restricted special fund theory" is distinguishable from the instant case because it was applied to a municipality upon which there are constitutional limitations on the amount of general indebtedness it can assume in a year and there are no such limitations on the University. Plaintiff nevertheless argues that the reasoning as exemplified by the "restricted special fund theory" was used by this court in *State ex rel. University of Utah* v. *Candland*, 36 Utah 406, 104 P. 285, 24 L.R.A.,N.S., 1260, in arriving at its conclusion that the Act involved therein authorizing the University to borrow from the State Land Grant Fund to construct a building was unconstitutional because it was clear that the debt would have to be paid by the state and not by the University. The act involved in that case provided that payments were to be made from funds to be appropriated for the use of the University, which funds, of course, were to be obtained through general taxation.

In arriving at the conclusion that the act was unconstitutional because it violated Sections 1 and 2 Art. 14 of the Utah State Constitution limiting state debts, this court used language which showed it believed the University, in spite of the fact that it was a corporation and therefore a legal entity, was an agency of the state incorporated for the convenience of the state in conducting that institution and any property it held belonged to the state and was merely held by the University in trust for the state. This being so, it reasoned further, that any debts the University incurred would be obligations of the state and any funds which could have been used by the University for its maintenance but which were diverted to other purposes would mean that the state would have to make up the funds so diverted by appropriations from general taxes. It is because of this reasoning that plaintiff contends that "the special restricted fund theory" in determining what is a debt under the constitutional limitations has been adopted by this court for state institutions as well as municipalities.

There would be merit to plaintiff's argument if that reasoning had been necessary for a decision in the Candland case. However, as this court pointed out in that case it was unnecesssary to decide whether the University as a legal entity could contract debts for which it ■ alone would be liable since the act in fact and in law contemplated that the debt should be that of the state. The facts in the instant case are entirely unlike those in the Candland case. It is not contemplated either by the Act nor by the proposed loan agreement that the state is to be the actual obligor. The payments are to be made only from funds derived from revenues obtained from the operation of the project and the income and interest from state land funds which the University has the right to use for its support and maintenance. A state cannot be sued like a municipality. In the event of a failure to pay the indebtedness the state would be under no obligation to appropriate money from general taxes to pay it. Such an

obligation is not a debt in the contemplation of the constitutional limitations unless we wish to extend the reasoning of the "restricted special fund theory" which we have applied to borrowing by municipalities and say that even though the state would not be legally obligated to pay the indebtedness it would be morally so obligated and in any event it might have to make up from general taxation the amount which the University expended from its income from land grant funds for this project which could have been used for other purposes. We do not choose to extend this doctrine to obligations assumed by state institutions. As pointed out in an interesting and informative article on this doctrine entitled "Municipal Improvements as Affected by Constitutional Debt Limitations" 37 Columbia Law Review, pages 192 to 197, on page 195:

"Superficially, the restricted special fund theory has attraction. The theory concedes that constitutional limitations refer to debts payable from taxation, but maintains that an obligation the result of which may be to deprive the general municipal funds of proprietary revenue then being received is in effect a contingent burden on the taxpayer; hence it is a debt.

"The answers to this line of reasoning are both logical and practical. If the validity of the special fund doctrine be assumed, the debt affected by constitutional limitations is an obligation for the payment of which the levy of taxes may be required. It is inconsistent with that assumption to treat as debt an obligation for the payment of which taxation cannot be required."

The above article also calls attention to the fact that the doctrine has proved unsatisfactory even as applied to municipalities and has been repudiated by some of the states which had previously adopted that theory. See also notes to that article commencing on page 209 for citation of cases on this subject. In view of the experience of other states with this doctrine we are not inclined to unnecessarily extend it.

Plaintiff also contends that the interest and income from the land grant fund cannot lawfully be used for building purposes but only for educational purposes. He concedes that whether that is true or not depends upon an interpretation of Sec. 8 of the Enabling Act which granted certain lands to the state for the establishment of the University of Utah and which provided that

"the proceeds of the sale of said lands, or any portion thereof, shall constitute permanent funds, to be safely invested and held by said State; and the income thereof to be used exclusively for the purposes of such university"

and Sec. 5, Art. 10 of the Utah State Constitution which provides that the permanent funds shall

"be safely invested and held by the State; and the income thereof shall be used exclusively for the support and maintenance of the different institutions and colleges, respectively, in accordance with the requirements and conditions of said Acts of Congress."

Plaintiff cites some early cases from Idaho and Washington, *Roach* v. *Gooding*, 11 Idaho 244, 81 P. 642 and *Sheldon* v. *Purdy*, 17 Wash. 135, 49 P. 228, which in interpreting similar provisions held that wording therein that the income was to be used for "university purposes" and for "support and maintenance" meant that it must be used for current expenses and educational purposes and not for building purposes. However, plaintiff admits that more recent cases from other jurisdictions have held the term "support and maintenance" authorized the construction of buildings. There is nothing in the wording of the enabling act nor in Sec. 5, Art. 10 of the State Constitution which compels us to find that the income from the permanent funds can only be used for current expenses of the University. Buildings are a necessary part of a University and the terms "support" or "maintenance" do not necessarily exclude the right to repair or construct them. As stated in *Arnold* v. *Bond*, 47 Wyo. 236, 34 P.2d 28, on

page 31 of the Pacific Reporter in answer to similar arguments made under provisions similar to ours:

"* * * the conclusion that the term 'support' excludes the right to use any part of the money for erecting buildings does not necessarily follow. The meaning of the term 'support' was discussed in the case of State v. Board, 8 Wyo. 104, 55 P. 451, 461, and it was held that it included the erection of buildings as well. The court speaking, through the late Chief Justice Potter, said: 'The statutes of this state have for many years provided that there shall be levied annually a tax "for the support of the common schools." * * *' 26 Stat. 222. Would it be contended, in the absence of express, adverse legislative provision, that school houses could not be erected or repaired from the proceeds of the tax, or the income, or avails from the donated public lands? Is not the erection of suitable buildings as necessary a part of the support of the common schools as the employment of teachers? What feature in the support of any public institutions is more essential than providing a house in which its operations may be carried on, or in making such repairs as its condition demands?"

See also *State ex rel. Blume* v. *State Board of Education of Montana*, 97 Mont. 371, 34 P. 2d 515.

We conclude that neither the wording of our enabling Act nor that in Sec. 5, Art. 10, of our State Constitution precludes the use of the income or interest from the land grant funds by the University for erection or repairs of buildings.

We adopt Mr. Justice McDonough's opinion on the construction of Chap. 126, L. Utah 1947 as the opinion of the court.

The peremptory writ of prohibition is denied and the Alternative Writ recalled. No costs allowed to either party.

CROCKETT, Justice concurs in the opinion of WADE, J., and also in the views expressed by McDONOUGH, J.

WOLFE, Chief Justice (concurring).

I concur. I have concluded that the phrase "support and maintenance of the different institutions and colleges, respectively * * *."

used in Section 5 of Article 10 of the State Constitution, includes building for university purposes. Support and maintenance of a university or college must be different than support and maintenance of a single or even a group of buildings. Maintaining a university must include maintaining a teaching force, which includes in turn paying sufficient salaries to obtain and keep first-class men, constructing buildings for the housing of students (dormitories) and for classrooms, laboratories and all the manifold and incidental structures necessary for the conducting of the various schools of the university. It would include kitchens, dining halls, auditoriums, student union buildings, field houses and stadiums, all of which are also designated as the subjects of self-liquidating projects in Chapter 38 of Title 53, U.C.A.1953. Under that phrase I opine that the University could accumulate the yearly revenue from the land grant fund over the years, and with the accumulations build a dormitory or contract for its building, or perhaps build it on force account, if there is no provision for advertising for bids in matters involving over a certain amount.

I opine also the resort to Chapter 38, Title 53, U.C.A. 1953 is not compelled. That chapter grants permission. I stated in my concurring opinion in *Spence* v. *Utah State Agricultural College,* 119 Utah 104, 225 P. 2d 18, at the bottom of page 34 of the Pacific Reporter:

"An examination of Ch. 126, Laws of Utah, 1947, reveals that said Ch. 126 is not a requirement that the University or College erect any new buildings. It is a tender by the Legislature of provisions to be pursued if the governing boards of either institution decides to erect any of the self-liquidating projects covered by the act but it leaves to those governing boards the decision as to whether they shall build such structures. * * *"

I am still of that opinion and might add that it is within the discretion of the Board as to how they shall finance the building; whether it shall be financed by borrowing or by savings out of "other sources." Having arrived at such

conclusion it follows logically (and would if otherwise concluded be highly illogical) that "other sources other than by appropriations by the legislature of the state of Utah" does not preclude using the income from the Land Grant Fund as a credit to be pledged to secure payment of dormitory bonds. There is nothing which expressly or by implication prevents the use of the income from the Land Grant Fund to be pledged for borrowings and their payment together with student building fees and the net revenues from the building. In fact, the Legislature has in Sections 2 and 3 of Chapter 38 of Title 53 so specified.

There is nothing in that chapter or elsewhere that I know of which requires us to read into the phrase "from other sources" a limitation that "other sources" are, because of subsection (7) of Section 3 of Chapter 38, Title 53, to be limited to revenue and rents from the building which includes student fees. The language in subsection (7) reading that

"the income and revenues  *  *  *  from the operation of the building, and are expressly required to be fully sufficient to assure the prompt payment of principal and interest on the bonds as each becomes due  *  *  *"

certainly cannot be construed to prohibit the use of gifts or bequests to the University expressly given for the building of dormitories or for University purposes generally. Certainly such funds, or the income therefrom, could be used or pledged to pay the bonds. What as intended was that the income and revenue derived from the operation of the building are expressly required to be fully sufficient to assure the prompt payment of any net still owing on principal and interest of the bonds as such net on each bond becomes due not otherwise taken care of by gifts, bequests and other sources *other than by [expected] appropriations by the legislature of the state of Utah*".

The limitations on "other sources" is that it must not include an expected appropriation of the Legislature as a

source. Of course, it could not include a gift, legacy or other source which by its terms was expressly dedicated to some other named special purpose or purposes in connection with the University. But the income from the Land Grant Fund is usable for support and maintenance of the University, which phrase, I take it, is roughly equivalent to "University purposes."

In so holding I deem it unnecessary to explore the question of the power of the Legislature to narrow, should it choose to do so, the purposes for which the income from the Land Grant Funds may be expended so long as those purposes were includable within "support and maintenance" as I interpret the meaning of that phrase found in Art. X, Sec. 5.

McDONOUGH, Justice (concurring).

The opinion of Mr. Justice HENRIOD correctly points out that neither in the briefs nor in the court's opinion in this case has the construction of Chapter 126, Laws of Utah 1947, been discussed. The reason it has not is that it was assumed that if the use of the interest on the land grant fund would not be prohibited by application of the "restrictive special fund doctrine" or the provisions of the Constitution and Enabling Act relative to the land grant funds, then it could be used under the provisions of the statute. Mr. Justice HENRIOD concludes that the statute itself does not authorize the use of the funds in question. I am of the contrary opinion.

Section 1 of Chapter 126, Laws of Utah 1947, now Section 53-38-1, U.C.A.1953, authorizes the University to build certain enumerated types of structures and "other self-liquidating projects, and other revenue producing buildings". The use of expression "self-liquidating" does not, of course, mean that the indebtedness incurred in errecting the structure, plus the interest thereon, must be obtained from the revenues from the structure

itself. This is evident from the body of the Act which defines what is meant by self-liquidating. Thus, the Board of Regents is authorized to

"collect student building fees from all students and to pledge said fees to the payment of building bonds"; Section 53-38-3, U. C. A. 1953, subsection (3).

In addition, the University is authorized to borrow the money upon the credit of those various items and "other sources other than by appropriations by the legislature of the state of Utah". The expression "self-liquidating" is not, in all cases, as restricted in meaning as to require that the structure itself produce all of the moneys to pay off the indebtedness incurred in its erection. See *Greenhalgh* v. *Woolworth,* 361 Pa. 543, 64 A.2d. 659, 662, 663.

Addressing next Section 2 of the Act: It authorizes the Board of Regents

"to borrow money on the credit of the income and revenues to be derived from the operation of the building, and on the imposition of student building fees or both, or from other sources other than by appropriations by the Legislature of the State of Utah  *   *   *."

Section 2, upon which much reliance is placed in the opinion of Mr. Justice HENRIOD, provides that the bonds

"shall be special obligations payable solely from the revenues to be derived from the operation of the building and student building fees, etc.  *   *   *."

It must be conceded that the use of "etc." in a statute is not only unusual, but, were it standing alone without context to give it meaning, it would be too indefinite to permit its application. But it seems clear in view of the previous section of the act that "etc." is used to mean precisely what "other sources" means in Sec. 53-38-2, U.C.A. 1953, namely, "from other sources other than by appropriations by the legislature of the state of Utah." Unless given that meaning in Section 53-38-3, then the em-

ployment of such words in the previous section becomes meaningless. What clearly was meant is that the Regents of the University might look to any other source *which is available to the University for building purposes*. I shall return to this concept later on. Presently, I address myself to subsection (7) of 53-38-3.

Subsection (7) is one of 11 subsections of the section referred to. Those 11 subsections relate to the authority of the Board in taking action to assure payment of the bonds which are to be issued. The introduction to such subsections is as follows:

"In order to secure the prompt payment of such principal and interest and the proper application of the revenues pledged thereto the Board is authorized by appropriate provisions in the resolution or resolutions authorizing the bonds";

to do various things. Among them are those specified in subsection (7). That subsection authorizes the Board

"to fix rents, charges and fees, including student building fees, to be imposed in connection with and for the use of the building and the facilities supplied thereby, which rents, charges and fees shall be considered to be income and revenues derived from the operation of the building, *and are expressly required to be fully sufficient to assure the prompt payment of principal and interest on the bonds as each becomes due * * *.*" (Emphasis added.)

The requirement, it is to be noted, is not that those fees specifically enumerated are to be sufficient to pay the principal and interest on the bonds, but to assure the prompt payment thereof. This wording is significant. It is plain from the very section of the statute in which this requirement is found, as well as the previous section, that it was the intention of the Legislature that other sources be available for payment of the principal and interest of the obligations. The grant of authority to the Board to resort to "other sources" is contained in the preceding section. The section under discussion deals with the steps to be taken to provide for liquidation of the bonds. Hence the

Board in fixing fees, charges and rents which will be sufficient to assure prompt payment of the principal and interest of the bonds, may take into account other sources of income pledged to their payment. To give any more restricted meaning to the requirement of subsection (7) is by implication to give no meaning to the "other sources" provision of both Sections 2 and 3. We cannot ascribe to the Legislature an intention to withdraw an authorization given in one sentence by another sentence in the same section. If this be the proper construction of subsection (7), then we have merely to determine whether or not the income derived from the land grant funds is encompassed within the phrase "other sources other than by appropriations by the legislature of the state." That is, other sources available for building purposes.

To attempt to restrict the meaning of the "other sources" as used in the statute under the doctrine of "ejustem generis," to revenues derived from the building other than the customary revenues received therefrom is to give it no meaning at all; because in the very sentence in which the phrase "other sources" is used, all of the income and revenues to be derived from the operation of the building are specifically mentioned as a source for the payment of the bonds. Furthermore, if "other sources" as used in the Act does not authorize recourse to the building and maintenance fund hereinafter referred to, I am unable to apply such words to any other source. If grants, devises, or bequests were made to the University for building purposes, the Regents have, and have had for many years, authority to use them for that purpose without authorization in the 1947 enactment. By Section 53-31-3, U.C.A. 1953, the University is given authority to take such grants, devises or bequests of money or property. It is therein provided that

"it may convert property received by gift, grant, devise or bequest and not suitable for its uses into other property so available or into money. Such property so received or converted shall be held, invested and managed, and the proceeds thereof used by the board, for the

purposes and under the conditions prescribed in the grant or donation."

It may well be, as suggested in the opinion of Mr. Justice HENRIOD, that the "dedicated credits" mentioned in Chapter 85, Laws of Utah 1951, may, under the construction here given of the statute, be available to supplement revenues and income from the building and student building fees in the construction of a building or buildings authorized by Chapter 126, Laws of Utah 1947. The credits mentioned in Ch. 85 have since 1915 been set aside for a specified purpose. Chapter 30, Laws of Utah 1915, provided

"All moneys received by the University of Utah as entrance or tuition fees or moneys received from any source whatsoever shall be paid into the State Treasury at the close of each month, and shall be placed to the credit of the maintenance account of the University of Utah."

This provision remained substantially unchanged until 1939 when, by amendment, such moneys were placed to the credit of the *maintenance* and *building accounts*. As amended the provision reads:

"All money received by the university of Utah or Utah state agricultural college from any source whatsoever, except as otherwise provided, shall be paid into the state treasury at the close of the months of June and December of each year, and shall be placed to the credit of the maintenance and building accounts of the respective institutions". See Chapter 70, Laws of Utah 1939, and Section 75-2-6, Utah Code Annotated 1943.

Interestingly, although in 1951 it was provided that the "dedicated credits" should be retained by the University of Utah and used in its work program, the provision quoted above from the 1939 statutes was carried into the Utah Code Annotated 1953 as Section 53-34-6. Such credits, then, are still set aside in a maintenance and building account.

While such dedicated credits might be so used, I am not so fearful of the dangerous implications of the construc-

tion indulged as is my associate. This for two reasons: First, such "other sources other than by appropriation" are to be used to supplement the revenues from the building and student building fees. Secondly, should the Board of Regents of the University of Utah be so unmindful of the maintenance requirements of the University as to attempt to use the total of the dedicated credits for building purposes—an attitude upon the part of the Board of Regents which their past conduct and their standing in the community would not justify us in anticipating—the Legislature has the authority to curb such raids. It is not likely that the visualized building expansion program will be undertaken before the next legislative session. If the grant of authority relative to the use of the "dedicated credits" be thought to be too broad, the Legislature can narrow it.

As to whether or not the interest on the land grant funds is available for building purposes, we are required to define "support and maintenance" as used in Section 5, Article 10, of the Utah State Constitution quoted in the opinion of Mr. Justice Wade. I agree with the meaning given thereto in the opinion, namely, that such phrase is not so restrictive as not to include the building of buildings or the purchase of sites therefor. So concluding, I am compelled to likewise conclude that the income from such funds is encompassed within the phrase "other sources other than by appropriations by the legislature." I think we must so conclude unless we are of the opinion that in using such phrase the Legislature had in mind what is termed in the opinion of Mr. Justice WADE the "restrictive special fund theory," and legislated with that concept in mind. I do not think that they did. I find nothing in the words used or the implications thereof which would justify such conclusion. I therefore think the act itself authorizes the use of the funds and in accordance with the opinion of Mr. Justice WADE believe that the restricted special fund theory as applied to the constitutional pro-

vision invoked should not be adopted to preclude the securing of the bond issue by the income from such funds.

HENRIOD, Justice (dissenting).

I dissent, respectfully suggesting that those of the majority opinion who participated in *Spence* v. *Utah State Agricultural College,* appear to have departed from former concepts as to the nature and extent of authority granted under Chap. 126, L.Utah 1947. In so doing, the door is opened for invasion of public funds never contemplated by that statute.

This is a suit allegedly instituted on behalf of all taxpayers, advocacy for whom seems to be mostly honored in absence. Nowhere are the true purpose and intent of Chapter 126 discussed, and only a passing reference is made to *Spence* v. *U. S. A. C.,* — the case which in the opinion of the writer is controlling here. There is no discussion or reference at all to the implications of the majority opinion, and great emphasis is placed on the Candland case and the special fund doctrine, both of which may or may not be pertinent. But the context of the act itself and the principles enunciated in the Spence case certainly seem pertinent here. Nowhere has counsel for either side discussed principles of statutory construction applicable to or the real meaning of the ephemeral words "other sources" and "etc." around which this entire case of necessity must revolve.

In passing, it is submitted that so far as this case is concerned, whether the income from the land grant fund may be pledged for the payment of the bonds depends entirely on the language of Chap. 126, (now 53-38, U.C.A. 1953) since all of the litigants here assert their claims solely under the provisions of Chap. 126, and no question of general, independent or inherent power is involved.

Mr. Justice WADE asserts that the question to be determined here is whether pledging the income from the land grant fund in addition to revenues derived from the opera-

tion of the project would make the loan a debt payable by the State and hence unconstitutional. That may be *one* of the questions here, but there are other important questions first to be determined, viz.: 1) whether the specific language of Chap. 126 authorizes the use of the income from the land grant fund, and 2) whether this court has or has not already settled the interpretation of Chap. 126 as excluding such use.

A casual reading of the act indicates that it authorizes only "self-liquidating" projects, which, as reflected in the Spence case, means that the cost is payable out of the project itself, and which logically demands use of funds produced by the project itself, to the exclusion of funds not produced from its operation and existence. The act's title reflects the legislative intent that this is so when it authorizes the Board of Regents to "Fix Rents, Charges and Fees *to Assure Payment of Principal and Interest*" of the bonds. The very first section (Sec. 1) authorizes the Board to set aside portions of the campus to build dormitories, kitchens and the like and *"other self-liquidating projects."* Sec. 2 authorizes the borrowing of money on the credit of the income and revenues *"to be derived from the operation of the building,"* on the imposition of student building fees or both, or from other sources "other than by appropriations by the Legislature," and to issue bonds to raise the money, such bonds to be payable *"from the combined revenues of all buildings acquired and/or student building fees to be collected."* Sec. 3, part of whose subtitle is *"Special Funds,"* declares that the bonds shall not be obligations of the State, the University or its Regents, but *"shall be special obligations payable solely from the revenues to be derived from the operation of the building and student building fees, etc."* In order to assure prompt payment of the bonds, the Board of Regents, by resolution can "covenant as to the *operation of the building"* and administer the revenues *"derived from such operation."* It is further authorized by resolution to collect *"student building fees"* and to pledge

"said fees" for the payment of the bonds; also to *"fix rents, charges and fees"* which *"shall be considered to be income and reevnues derived from the operation of the building, and are expressly required to be fully sufficient to assure the prompt payment of principal and interest on the bonds as each becomes due."* Further, the Board is authorized to covenant against any other obligations payable "from the *revenues to be derived from the building."* Sec. 6 that all *"income and revenues derived from the operation of the building"* shall be deposited in a bank. Sec. 9, allowing for an alternative method of financing through a non-profit corporation, nevertheless provides that the Board can agree with the corporation to "make such fees and charges *adequate* to provide a sum *sufficient* to pay the cost \* \* \* and the amortization of the cost of the building."

Such language makes it obvious that the act itself contemplates only "self-liquidating" projects, to be paid for out of funds produced by the project itself. Neither the majority opinion, nor counsel, discusses the language of the act or its purpose, except the phrase "other sources" and the abbreviation "etc.", — whatever those words mean. "Self-liquidating" should, from the act's language alone, mean but one thing—that the project pays for itself without resort to any funds other than those it produces. Little solace comes in arbitrarily concluding that "other sources" includes something unspecified in the act or something that is antithetical to such concept of self-liquidation. The majority opinion takes phrases, meaningless unless viewed in the light of the context of which they are a part, and attaches to them a connotation that is unnatural, illogical, unreasonable and unsupportable under any syllogistic reasoning, — a meaning that does violence to the logic and reason of the rule "ejusdem generis," a rule prescribing that general words following those of specific meaning, shall not be construed in their widest extent, but apply only to the same general kind of thing mentioned by those preceding. Applying the rule to this case it appears obvious that the

phrase "other sources" is akin to "income and revenues *derived from the operation of the building,*" and to "student building fees." It takes little imagination to conclude that "other sources" in this case easily could include rental for use of a hall or a classroom in the building itself, rental for use of the grounds or other parts of the premises such as the cafeteria, rental of the dormitory rooms to private citizens at times when school is not in session, income from the sale of surplus heat to public or private interests, proceeds from the sale of used furniture, books, equipment, or advertising space, and a thousand and one other items of income derived from the project itself. Although none is specifically mentioned in the act, all would fall within the category of "other sources" of income from the "operation of the building" and would satisfy the rule "ejusdem generis." On the other hand it is difficult to know how the rule would be satisfied by including within the term "other sources," in a self-liquidating project, the income from a land grant fund which was in existence for over half a century before the self-liquidating project ever was born.

Mr. Chief Justice WOLFE seems to justify his position by asserting that there is no reason to exclude gifts and bequests made to pay the bonds or for university purposes. The fundamental fallacy of such assertion is two-fold: 1) if the gift be earmarked to pay the bonds, the existence of the project is the *reason* for the gift, and therefore a court easily could conclude that such gift is included in "other sources" resulting from the operation of the project itself, such as rentals and student building fees, since the gift is the result of the existence of the project, else it never would have been made, — all of which satisfies the rule "ejusdem generis" logically and factually; and 2) a gift does not affect the taxpayer adversely, but operates in reverse, and represents a windfall to him that actually cuts his tax burden rather than raiding funds in which he has a vested interest, requiring replacement by taxes if dissipated.

The dangerous implications of the majority decision are pointed up when one refers to Chap. 85, L.Utah 1951, which provides that

"The dedicated credits, such as tuitions, fees, federal grants, and proceeds from sales, received by the university and colleges may be retained by these institutions and used in accordance with each institutional work program."

In the biennium ending June 30, 1951, the University acquired $4,078,561.35 of such dedicated credits,[1] and the estimated amount of such credits for the biennium ending June 30, 1953, is $3,637,231.[2] In other words, the University receives about $2,000,000 of dedicated credits annually, included in which is the income from the land grant fund, which amounts only to about $25,000 per year, significantly the smallest or one of the smallest dedicated credits possessed. If the dedicated credit known as "Fees and Licenses" which amounts to about $1,350,000 had been pledged, or committed, if you please, to secure or pay the contract here, the taxpayers' burden of replacement would have ben pointed up in bold relief, and the decisions in the *Spence, Candland and Barnes* v. *Lehi City*, 74 Utah 321, 279 P. 878, cases then would have assumed considerably more significance. But by pledging the income from the land grant fund, the smallest dedicated credit available, we have been lulled into a false sense of security on the theory that a little pregnancy is unobjectionable. In this respect, the writer is unimpressed with oral arguments that there is only a remote possibility that the income from the land grant fund ever will be needed. Little pregnancies seldom result in the still-born.

Under the authority of the main opinion, there seems to be little or no reason why the $2,000,000 annual dedicated

---

[1]Utah State Auditor's Report for periods ending June 30, 1950 and June 30, 1952.

[2]Governor's Biennial Budget, transmitted to the Legislature, Jan. 15, 1951.

credits of the University, and lesser but nonetheless staggering annuities of other institutions of the State,[3] could not be used for constructing "self-liquidating" projects under Chap. 126. Nor is there any reason that such amounts could not be so used annually in the future. Any substantial use of such funds makes obvious the necessity of replacement by legislative appropriation out of tax funds, — in fact, such amounts not only would require replacement, but the added construction, representing an expansion of the institution, would demand additional public funds for support and maintenance. It becomes apparent what the unnecessary and unjustified interpretation of "other sources" and "etc.", contained in a statute designed for purely self-liquidating projects *could* do, and illustrates the point that conclusions arrived at because of the exigencies of a particular situation, might loom as spectres later come to haunt us.

Great emphasis has been given to the Candland case and to the principle of the special fund doctrine, while very little has been accorded the act or the decision in *Spence* v. *U. S. A. C.*, — to the point where the writer suggests we can't see the forest for the trees. The facts in the Spence case were identical to those here, except that in the instant case, something new has been added, — an attempted use, under the very same statute, of funds quite foreign and logically inimical to the concept of self-liquidation. But the decision in the Spence case certainly strikes down the use of any such funds not produced by the project itself. The very reason that *Spence* v. *U. S. A. C.* was decided as it was (and the majority opinion and concurrence of Mr. Chief Justice WOLFE clearly bear me out), is that the Agricultural College carefully pledged *only* those funds produced by opera-

[3]Departmental Estimated Dedicated Credits for Biennium ending June 30, 1953; University of Utah, $3,637,231; U. S. A. C., $2,135,-084.48; Weber College, $452,265.00; Carbon College, $94,100.00; Branch Agricultural College, $54,100.00; Snow College, $50,176.00; Dixie College, $49,500.00.

tion of the project, and carefully *avoided pledging* any funds *not* produced by the project. The decision in that case clearly reflects that it was rendered only because the project was "self-liquidating" and *did not* call upon any other funds than those charged for rentals and student building fees, negativing any idea that funds other than those produced by the project could be tapped. Mr. Justice LATIMER without doubt indicated that had any funds been suggested for use other than were produced from the project itself, the college would have exceeded its authority under the statute, when he said, in giving his reasons for the decision, that:

"The bonds which will be sold to the public show  *  *  *  *that money necessary for repayment cannot be obtained from sources other than from the revenue and income derived from the operation of the student union building and the student fees paid by students of the college".* [225 P. 2d 28.]

Such language and the entire tone of the decision indicate that had there been an attempt to use other funds than those produced by the project itself, a violation of the same statute, Chap. 126, L.Utah 1947, (under which defendants here have claimed, and under which they must stand or fall), would have occurred.

It seems obvious that Mr. Chief Justice WOLFE felt the same way since he used the phrase "self-liquidating" on 9 occasions in his opinion, and the phrase (or substantially the phrase) that the bonds were payable *"solely* from the revenues to be derived from the operation of the building and student building fees" about as many times. It would seem that his present position deserts his language in the Spence case when he said:

"The Legislature *by the passage of Ch. 126* sought to avoid the effect of Sec. 1 of Art. XIV by permitting the issuance of building revenue bonds, the principal and interest of which were to make payable *entirely* and *only* out of revenues *derived from the building itself* and thus by making such bonds a charge aainst a *special fund".*

Also it is to contradict his further language that:

"If the Board decides to build, Ch. 126 provides the manner and method of issuing revenue-building bonds which are made payable as to principal and interest *only* out of the revenues *derived from the building* which is constructed."

Nor is his present position consistent with his remarks there that:

"Ch. 126 * * * furnishes legislative authority for the issuance and sale of negotiable revenue bonds for the purpose of financing the building of certain *self-liquidating* projects * * * under certain conditions, *limitations and restrictions. One of these restrictions* is that the bonds issued should not constitute an indebtedness * * * *but shall be special obligations* payable *solely* from the revenues to be *derived from the operation of the building and student building fees."*

Other language of the Chief Justice in that case, is similar, and as emphatic. It is no answer to say the University could build without authority of Chap. 126. That problem was raised unsuccessfully by amicus curiae in the Spence case. Here, unlike there, the question is not even raised, and the parties have chosen to stand or fall under the provisions of Chap. 126 which necessarily involves only the construction to be placed on that statute's language, particularly the words "other sources" and "etc." It is impossible for the writer to understand how the Chief Justice conceivably can conclude that income from the land grant fund is includable in the phrase "other sources" in Chap. 126, in the light of his expressions in the Spence case, — unless he intends to reverse himself, rendering impotent the word "self-liquidating" which he used so freely and unequivocally in the Spence case.

The special fund doctrine was born in *Barnes* v. *Lehi City,* has never been repudiated and has been reaffirmed time and again. We are invited to repudiate it now because some other jurisdictions have done so. Why they have done so is the subject of many debatable explanations, not the

least of which might be a changing attitude in the past few decades looking toward a more indiscriminate use of taxpayers' money to satisfy the exigencies of an existing economic emergency. But the doctrine, though repudiated elsewhere, has foundation in good sense, since it is based primarily on the protection and preservation of taxpayers' funds. The principle is embodied in constitutional interdictions against tax levies in excess of those expressly granted. This court consistently has frowned on plans and schemes to circumvent that philosophy, as is reflected in the decisions and language of *State* v. *Candland, Barnes* v. *Lehi, Fjeldsted* v. *Ogden, Wadsworth* v. *Santaquin, U. P. & L.* v. *Ogden City,* 95 Utah 161, 79 P. 2d 61 and *Spence* v. *U. S. A. C.* It is difficult to determine how this court now can say that the plan of the defendants to use income from the land grant fund, a fund having no connection with the project, can be a part of a special fund created by a project that is supposed to pay for itself.

Mr. Justice WADE attempts to distinguish the instant case with the group of cases cited above on the theory that the former involves a state institution while the latter involves municipalities, giving as a reason for the distinction the fact that the state, unlike municipalities, cannot be sued. He has overlooked the fact that in the very case which gave birth to the doctrine, *Barnes* v. *Lehi City,* the municipality was not subject to suit under any circumstances, the contract giving rise to the litigation expressly providing for non-liability on the part of the city. The special fund doctrine is not predicated on any tenuous distinction as to whether an institution can or cannot be sued. It is bottomed, rather, on the fundamental principle that where a fund created by an improvement is charged with full payment of its cost, without additional burden on public funds, it is a valid constitutional arrangement, and if there is an attempt to include in such fund, other funds in which the taxpayer has a vested interest, requiring replacement with public funds other than those solely produced from

the improvement itself, such attempt is constitutionally objectionable until and unless all constitutional interdictions first have been observed. It is submitted that the inclusion here of the income from the land grant fund in the so-called special fund to be created by the dormitories themselves, fails to stand the test of the special fund principle since it obviously takes university funds (and therefore state funds) and commits them to a "self-liquidating" project, which is rendered not "self-liquidating" if it does not pay for itself. It is no answer to say the State cannot be sued and is not legally obligated to pay, since it is unrealistic to say that the State will not carry out its mandatory duty to support the University in perpetuity, which requires the substitution of funds pledged to that support if for one reason or another they are lost or dissipated.

Mr. Justice WADE concedes that the special fund doctrine applies in the case of municipalities, but that it should not be extended where a state institution is involved. To say we are extending the doctrine when we apply it to state institutions is an ipse dixit, since the doctrine, if sound, is applicable in both instances, — perhaps more so where a state institution is involved, since more taxpayers are involved. It was held applicable, without distinction and without any suggestion of extension of the doctrine, to an improvement planned by a state institution, in *Kasch* v. *Miller,* 104 Ohio St. 281, 135 N.E. 813.

As to *State* v. *Candland,* which declared that a loan of the land grant fund to the University created a debt of the State, that case has never been repudiated in this State. The majority opinion attempts to distinguish that case from the instant case by asserting that the act authorizing the loan in the Candland case in fact and in law contemplated that the debt created was that of the State. It was *this court* that said the act contemplated a State debt, — the act itself specifically stating that "such loan shall be a debt of the University of Utah, and *not* of the State of Utah." Laws 1909, c. 124, §2. So that the distinction attempted

to be made by the majority opinion seems unmeritorius since, in the instant case, we just as reasonably could say that Chap. 126 in fact and in law contemplates that the pledge of the land grant fund income is in fact and in law a pledge of the State.

The writer can see no practical difference of obligation on the part of the State where the corpus of the fund is loaned, or where the income therefrom is used. The Candland case, whose wisdom is reflected in its language far better than this writer can assert, says the loan to the University was a subterfuge to circumvent the constitution. In the instant case, using the income from the land grant fund is a subterfuge not only to circumvent the constitution, but a device to weaken or destroy the special fund doctrine and read into a statute authorizing only self-liquidating projects, something that isn't there. If all of the $8,000,000 of dedicated credits available to the University in the past two bienniums had been used up on "self-liquidating" projects under the provisions of Chap. 126 and the authority of the main opinion, it is obvious that all or a goodly portion of such amount of necessity would have required replacement by appropriation of public funds, in which event the wisdom of the Candland case, the special fund doctrine, and the Spence case readily would have become crystal clear. To say that in such case the state could not be sued, would not be obligated legally to replenish such fund, but has only a moral obligation to do so, is to blind oneself to reality, particularly since the public is charged with the duty of supporting and maintaining the University in perpetuity. The replacement of the $8,000,000, or the smaller amount representing the income from the land grant fund is a matter of degree only, but the implications of the main opinion persist nonetheless—regardless of the magnitude of the one situation or the pusillanimity of the other.

These funds not only cannot be pledged for the reasons heretofore stated, but they cannot be pledged or used under

the very wording of Chap. 126 which the majority opinion uses to arrive at its result. Great stress is laid on the words "other sources." The entire phrase is "other sources *other than by appropriations by the legislature.*" The interest from the land grant fund is a dedicated credit, and dedicated credits are biennially appropriated by the Legislature. They not only are appropriations, but must be expended for educational purposes *before* other general appropriations of the Legislature are expended.

Under Chap. 123, Laws of Utah, 1951 (and the same is true under the 1953 act, not yet published, but being H.B. 239, 30th Legislature), which is entitled "Appropriations Act of 1951", it is provided in Sec. 11 and

"All * * * dedicated credits * * * shall be deposited at least monthly and shall be credited * * * to the appropriations account * * *. Such * * * dedicated credits shall be first allotted for expenditures to the extent of such collections. All * * * dedicated credits shall be subject to all provisions of law applicable to appropriated funds * * *."

It is obvious, therefore, that the interest from the land grant fund cannot be pledged or used to pay for a building under the self-liquidating provisions of Chap. 126, since it does not come from another source "other than by appropriations by the Legislature." In fact, were this item not an appropriation by the Legislature it still couldn't be used as a practical matter, since, being a dedicated credit, it must be deposited at least monthly and must be "first alloted for expenditure." Furthermore the interest from the land grant fund, if any remains, lapses two months after each biennium and ceases to exist, as is provided in Sec. 10 of the 1951 Appropriations Act (and the same provision is found in the 1953 Act), where it is provided that

"The state finance commission shall, on or before August 31 * * * close out to the proper fund or account all unexpended balances of appropriations * * *."

The same is true of all dedicated credits.

Since the foregoing was written, my learned colleague, Mr. Justice McDONOUGH, has written an opinion which not only attempts to refute what has been said in this dissent but apparently represents a reversal of his concurrence in *Spence* v. *U.S.A.C.*, Utah 225 P. 2d 18, which opinion I shall discuss hereinafter.

The report of this decision in The Salt Lake Tribune of April 23, 1953, in part confirms the matters about which I am concerned, but about which Mr. Justice McDONOUGH apparently is not, when it reported that the comptroller of the University, stated that this decision cleared the way for the $1,800,000 Union Building. This being so, there is no reason, under the main opinion, why $1,800,000 of dedicated credits could not be used to build the new, second and additional Union Building, and if this were accomplished, it becomes obvious that the taxpayers would have to replace the $1,800,000 by appropriation at the next legislature.

In defense of my position, I feel constrained to answer what Mr. Justice McDONOUGH has to say. He cites *Greenhalgh* v. *Woolworth,* to support his statement that

"The expression 'self-liquidating' is not, in all cases, as restricted in meaning as to require that the structure itself produce all of the moneys to pay off the indebtedness incurred in its erection."

The case may be authority for such a broad generalization but it does not say that Chap. 126 is the type of statute where "self-liquidating" does not mean what it says. He fails to point out that the Greenhalgh case, supra, is not similar in any respect to the case here, and that the Greenhalgh case actually and specifically recognizes that there are situations like that here where "self-liquidating" means just that — "self-liquidating."

Mr. Justice McDONOUGH says

"The use of the expression 'self-liquidating' does not, of course, mean that the indebtedness incurred in erecting the structure  *  *  *

must be obtained from the revenues from the structure [project] itself."

This is an ipse dixit which, I believe and respectfully suggest, Mr. Justice McDONOUGH fails to support. He says that "self-liquidating" does not mean "self-liquidating" because that fact is evident from the body of the Act which defines what is meant by self-liquidating. The body of the act does not specifically define the word, but the repetition of the word "self-liquidating" in the act seems to contradict Mr. Justice McDONOUGH's conclusion. In supporting his contention he has lifted out of the context of the act subdivision (3) of section 3, Chap. 38, Title 53, which gives the Board of Regents authority

"to '*collect* student building fees from all students and to pledge said fees to the payment of building bonds'",

and then assumes that this means fees from students other than those using the facilities of the project. It is submitted that the phrase mentioned applies only to those taking advantage of such facilities, if read in light of the entire context of the act. Such construction of the act is clearly shown to have been intended in subdivision (7) of the same chapter, having to do with the power to *fix* such fees, when it says the Board can

"fix rents, charges and fees, including student building fees, to be imposed *in connection with and for the use of the building and the facilities supplied thereby,* which rents, charges and fees shall be considered to be income and revenues *derived from the operation of the building, and are expressly required to be fully sufficient to assure the prompt payment of principal and interest on the* bonds * * *."

It seems clear, therefore, that the construction given the phraseology of subsection (3) is not only strained, but is negated in the very section from which Mr. Justice McDONOUGH lifts a phrase, and to which he attaches an important significance.

Mr. Justice McDONOUGH says that as to subdivision (7)

"It is plain from the very section  *  *  *  that it was the intention of the Legislature that other sources be available for payment of the principal and interest  *  *  *."

It would seem that it is not only *not* plain but it is very plain that the Legislature intended just the opposite when it says that such rents, charges and fees (from the building) are *"expressly required* to be *fully sufficient* to assure the *prompt payment"* of the bonds. To attach any connotation to the word "fully" other than that with which it universally is accompanied simply is to ignore its meaning; and to say the wording only means that such rents, charges and fees are supplemental to something else is to ignore the whole act, which announces in its very first section that it authorizes "self-liquidating" projects, — not the type of project where 99% is paid out of dedicated credits and 1% from the revenue it might or might not produce.

Mr. Justice McDONOUGH asserts that to restrict the phrase "other sources" to revenues derived from the project is to give the phrase no meaning at all, because the sentence in which the phrase is used specifically includes all of the income and revenues to be derived from the operation of the building. This is not so. My learned colleague forgets that the legislature did *not* include in the sentence mentioned other sources of income such as a gift earmarked for payment of the bonds, a legacy charged with the same trust, sales of used equipment no longer needed, sales of advertising media, and a host of other conceivable sources of income that might spring from the existence of the project itself, and only by reason of its existence.

Mr. Justice McDONOUGH speaks of Title 53-31-3, U.C.A. 1953, in support of his contention. This section has nothing to do with this case, was never mentioned by counsel in argument or brief, — and I repeat that the litigants must stand or fall within the four corners of Chap. 126, and

not within those of some other statute. It is obvious that this other statute has no relevancy, since it is designed only to allow the acceptance of gifts charged with a trust, and if the trust imposed is for payment of the bonds, then the gift must be used to help pay the bonds, — which would be an item included in "other sources" which spring from the existence of the project itself, — else the gift never would have been made.

Mr. Justice McDONOUGH discusses dedicated credits as going into a maintenance and building fund under the statute. No one has any quarrel with such statute, but it is difficult to see how that has anything to do with this case. Such fund has other statutory interdictions, and if the legislature had intended to have such funds usable under Chap. 126, it would have been a simple matter to have said so. If that were the case, there would be little need for Chap. 126, the self-liquidating project statute. The University could then issue building bonds and pledge the monies in the maintenance and building fund without Chap. 126. Without discussing them, it is suggested that serious questions of sanction for such procedure would arise.

I join in the confidence Mr. Justice McDONOUGH reposes in the present Board of Regents and our future legislatures, but such confidence hardly is a basis for an opinion of this court, and amounts only to saying that we think a Saviour likely would not be followed by a Judas. His statement that

"It is not likely that the visualized building expansion program will be undertaken before the next legislative session"

was made meaningless by the pronouncement of one of the University's officials that this decision clears the way for a $1,800,000 new building in addition to the dormitories.

The attempt to include the income from the land grant fund in this obviously self-liquidating project violated Chap. 126, Laws of Utah 1947, the constitution as reflected in the

Candland case, the decision in *Spence* v. *U.S.A.C.*, and the special fund doctrine, and the relief prayed for should have 'been granted.