(July 1, 1905.)

# ROACH v. GOODING.

[81 Pac. 642.]

APPLICATION FOR WRIT OF MANDATE—ISSUANCE OF BONDS—PAYMENT THEREOF—UNIVERSITY LANDS—PROCEEDS OF SALE THEREOF—PERMANENT SCHOOL FUND—INTEREST THEREOF—SUPPORT OF SCHOOLS —UNIVERSITY PURPOSES—CONSTITUTIONAL LAW.

1. Under the provisions of an act of Congress, approved February 18, 1881, and the amendment thereof, granting to the territory of Idaho and other territories seventy-two sections of land for university purposes, and under the provisions of sections 5 and 8 of the Idaho admission act, and the fourth section of article 9

of the state constitution, the interest on the proceeds of such lands cannot be used for the erection or equipment of university buildings or buildings connected therewith.

2. The interest or income from the proceeds of the sale of such lands can only be used in the support and maintenance of such university in the payment of current expenses thereof and charges for conducting the same.

3. An act providing for the issuance of twelve thousand dollars in state bonds for the erection and equipment of a domestic science building, in connection with the State University, and providing for a sinking fund for the redemption of such bonds, approved March 8, 1905, held unconstitutional and void.

(Syllabus by the court.)

APPLICATION for a writ of mandate against the governor, treasurer, secretary of state, and attorney general of the state of Idaho.  Writ denied.

Wood & Wilson and Richards & Haga, for Plaintiffs, cite no authorities not found and commented upon in the opinion upon the points decided.

J. J. Guheen, Attorney General, Edwin A. Snow and F. S. Wettach, for Defendants, cite no authorities not found in the opinion.

SULLIVAN, J.—This is an application for a writ of mandate to compel the governor, secretary of state, treasurer and attorney general, of the state of Idaho, to advertise and negotiate the sale of bonds to the amount of $12,000, as provided by an act entitled "An act providing for the issuance of state bonds for the erection and equipment of a domestic science building, and prescribing how such bonds shall be issued and how the proceeds of the sale of such bonds shall be expended, and providing for a sinking fund for the redemption of such bonds," approved March 8, 1905 (Sess. Laws 1905, p. 221).

The petitioners, who constitute the board of regents of the University of the state of Idaho, recite in their petition their appointment and qualification, the passage and approval of the act above referred to and the several provisions of said act, and the refusal of said state officers to comply with the

provisions thereof in the negotiation and sale of said bonds, and pray that an alternative writ of mandate be issued and directed against said officers to compel them to proceed and negotiate and sell said bonds as in said act provided. To said petition the defendants demurred on the ground that the petition did not state facts sufficient to constitute a cause of action

It is alleged in the petition that said act provides that the payment of said bonds shall be secured by the interest upon moneys accruing from the sale of lands and timber belonging to the University of Idaho, and the act itself discloses the fact that no other provision is made for the payment of said bonds and interest. The main question is, Can the income, or any part thereof, of the proceeds of the university lands and timber be appropriated for the payment of said bonds and the interest thereof?

Section 1 of article 18 of the constitution provides, among other things, that the legislature shall not in any manner create any debt or liability unless it provides at the same time for the payment of the interest of said debt or liability as it falls due, and also for the payment and discharge of the principal of such debt or liability within twenty years of the time of contracting the same. Under the provisions of said section, if an indebtedness is created by legislative enactment, the payment of the principal and interest thereof must be provided for in such act.

It is contended by the attorney general on behalf of the defendants that said act is unconstitutional and void, for the reason that no legal provision has been made in said act for the payment of the proposed issue of bonds when they become due and the interest thereon, as the interest and income upon moneys accruing from the sale of lands and timber belonging to the University of Idaho is prohibited from being used for that purpose by the various acts of Congress granting said lands to the state and by the fifth and eighth sections of the Idaho admission act (26 Stats. at Large, p. 216), and the fourth section of article 9 of the state constitution. Under an act of Congress approved February 18, 1881 (21 U-

S. Stats. at Large, p. 323), there were granted to the territories
of Dakota, Montana, Arizona and Idaho, each, seventy-two sec-
tions of land for university purposes.   Subsequently to the ap-
proval of said act, the legislature of Idaho, by an act approved
January 30, 1889 (Sess. Laws 1889, p. 21), created the Univer-
sity of Idaho, and located the same at Moscow.   Thereafter,
and on the third day of July, 1890, Congress passed an act
commonly known as the Idaho admission bill, admitting the
territory of Idaho into the Union as a state, which bill pro-
vided for certain grants of land to the state for educational
and other purposes, and also provided how the proceeds of
the sale of such lands should be used, and also how or for
what purpose the interest and income on such proceeds must
be used.   Section 5 of said admission act provides, *inter alia,*
"That all lands herein granted for educational purposes shall
be disposed of only at public sale, the proceeds to constitute
the permanent school fund, and the interest of which shall
only be expended in the support of said schools."   Section 8
of said act provides, among other things, that "the act of Con-
gress granting said seventy-two sections of land to the state
shall be so amended as to provide that none of said lands
shall be sold for less than $10 per acre, and that the proceeds
shall constitute a permanent fund to be safely invested and
held by the state, and that the income thereof shall be used
exclusively for university purposes."

   Section 4 of article 9 of the state constitution provides that
the public school fund of the state shall consist of the pro-
ceeds of such lands as have heretofore been granted, or may
hereafter be granted, to the state by the general government,
and known as school lands, and those granted in lieu thereof,
and lands acquired by gift or grant from any person or cor-
poration under any law or grant of the general government,
etc.

   It is conceded by counsel for both parties that the provi-
sions of said section 5 of the admission bill relate  to all grants
made by the government to the state for educational purposes,
but the court is called upon, in this case, to only pass upon
the disposition or use that may be made of the interest and

income to accrue from the proceeds of the sales of the lands or timber thereon included in the seventy-two sections granted by Congress to the territory of Idaho under said act approved February 18, 1881, as amended by the admission act; then, what means that provision of section 5 of said admission act, to wit, "the interest of which [permanent school fund] only shall be expended in the support of said schools," and that clause in said section 8 of said admission act, to wit, "the proceeds shall constitute a permanent fund to be safely invested and-held by said state, and the income thereof to be used exclusively for university purposes"?

The provisions of said sections 5 and 8 are contained in the admission acts of North Dakota and Washington, and have been, by unanimous opinions of the supreme courts of those states, held to apply to all grants of lands by Congress to those states for educational purposes.

The supreme court of the state of Washington in *State v. Maynard, State Treasurer,* 31 Wash. 132, 71 Pac. 775, in construing section 11 of the admission act of that state, which is precisely the same as section 5 of the Idaho admission act, said: "It is contended by the relator that the last sentence of section 17 [which is the same as section 13 of our admission act] contains the only limitations upon the legislature with reference to the disposition of lands granted to the state normal schools, and that the limitations in section 11 [section 5 of our act] have reference only to sections 16 and 36 granted by section 10 [section 4 of our act] of the enabling act for the support of common schools, and a very plausible argument is made to sustain this contention. But this argument necessarily eliminates section 11 of this act as an independent section of the act, and also limits the general words therein used, namely, 'all lands herein granted for educational purposes' to mean all lands granted in section 10 [section 4 of our act] for common school purposes. If Congress intended section 11 to be only a limitation to section 10, and not to apply to the whole act, it was very unfortunate in the use of words to express that intention, even if the making of section 11 an independent section was an inadvertence. But,

taking the section as we find it, an independent section, in connection with the general words used, it seems conclusive to our minds that Congress intended to make it refer, not only to the preceding section, but to the whole act, and that the words 'herein,' and 'educational purposes' were used advisedly and refer to all lands granted for such purposes in the whole act.''

''The clause in section 17 (section 12 of our act) as follows: 'and the lands granted by this section shall be held, appropriated and disposed of exclusively for the purposes herein mentioned in such manner as the legislature of the respective states may severally provide,' refers to the manner of holding and appropriating and disposing of the lands, and must be construed with reference to the limitations contained in section 11 as to the lands granted for educational purposes. The manner of disposition or sale of such lands, and the manner of holding or investment of the proceeds and the appropriation of the interest and income, is subject to the limitations contained in section 11 of the act. The states of North Dakota, South Dakota and Montana have all placed the above construction upon the land grants for normal schools by adopting constitutional provisions declaring the proceeds of such lands a permanent fund. (See N. Dak. Const., art. 9, sec. 159; S. Dak. Const., art. 8, sec. 7; Mont. Const., art. 11, sec. 12.) We think this construction accords with the general policy of the federal government toward educational institutions named in the enabling act. It does no violence to any of the provisions of the act, and conduces to the permanency of the normal schools. If we are correct in this construction of the enabling act, it follows that the act of the legislature of 1895 is void, in so far as it attempts to appropriate the proceeds of the lands granted for normal schools, instead of the income and interest thereof, and that the treasurer cannot be compelled to pay out any part of the funds derived from the sale of the lands for either principal or interest on the warrant in question.''

It is true that that decision only involved the proceeds of lands granted for normal schools, and not the interest and

income thereof. The purposes for which such interest and income might be used was not decided in that case.

The question as to the use that the interest and income of the school fund might be devoted to was directly passed on in the case of *Sheldon v. Purdy,* 17 Wash. 135, 49 Pac. 230, where the court said: "That portion coming from the irreducible common school fund is devoted to the payment of current expenses. The building of new schoolhouses and the purchase of schoolhouse sites do not come within any authorized signification of 'current expenses.' Neither do they come within any well-defined acceptation of 'support of common schools.' Both the terms 'support' and 'current expenses,' when applied to the common schools of the state, mean continuing regular expenditures for the maintenance of the schools. Building a new schoolhouse and purchasing a site, while at times necessary and proper, are, as a rule, unusual and extraordinary expenditures."

The case of *Mitchell v. Colgan,* 122 Cal. 296, 54 Pac. 905, was a case involving the Whittier Reform School Fund, and the word "support" that is used in the act establishing said reform school was construed in that opinion. The court there said: "Of course, the word 'support,' as plaintiffs claim, may be said to mean 'for the use of said institution,' but, conceding this, it does not, in our opinion, aid plaintiff's construction; on the contrary, as we view it, it is strong proof that the legislature never intended to give the trustees unlimited power to divert the county and state money to the erection of buildings, which money was appropriated by the state and contributed by the counties for the 'support' and the 'care and keeping' of the children committed to the school." And it is clear to me that when Congress declared in section 5 of the admission act that the interest and income on the public school fund could only be expended in the "support" of the schools, it was not intended that any portion of it should be used in the erection or equipment of buildings, but only for current expenses, the support and maintenance of the school, for ordinary annual school purposes. Congress no doubt realized that, if the grants of the government for

school purposes should be used in the erection and equipment of buildings, that such grants might be exhausted in the erection of magnificent buildings rather than in the education of the children, and it is clear that the word "support" as used in said section means the maintenance of the school, the ordinary current expenses of maintaining the school, and not the erection of buildings or the equipment thereof. Something was left for the people themselves to do, to wit: To erect and equip the buildings, which does not come within the meaning of the word "support."

As incidentally bearing on the question here involved, see *State v. McMillan*, 12 N. Dak. 280, 96 N. W. 310. It is there stated in the syllabus, which is by the court, that the lands granted to the state of North Dakota by Congress for educational purposes, and the proceeds of the sale thereof, constitute a permanent trust fund, the interest and income of which alone may be used by the state and then only for the support of such schools as are designated by the enabling act and the state constitution. The precise question involved in the case at bar was not decided in that case, but it is apparent, from the language there used, what the decision of that court would have been had the question at bar been involved there.

Counsel for plaintiffs further contend that the words "university purposes," as used in section 8 of the admission act includes the erection of buildings. We cannot agree with that contention, as the provisions of that section must be construed in connection with the other provisions of said act taking them all together. It is clear that it was not intended to permit the interest or income from such funds to be used in the erection or equipment of buildings. As we view it, the "purpose" of the university is not in any sense the erection or equipment of buildings therefor. As is clearly shown from the various acts of Congress from that of July 2, 1862, including the act of February 18, 1881, and the amendments thereof, and the acts of admission, admitting many states into the Union, the general attitude and policy of Congress has been to provide an endowment fund for educational purposes, the income thereof only to be used to support the in-

stitution, leaving the people of the state to furnish the buildings. Observation and experience has shown that that is a correct policy, for the history of the various states show that the inclination of the several legislatures has been to use a great portion of such grants to erect magnificent buildings for school purposes, regardless of the necessity for such buildings. Even in our own state numerous attempts have been made by the legislature to pledge or pawn not only the interest and income of the proceeds of such lands, but the proceeds as well, in the erection, construction and equipment of buildings. In *State v. McMillan, supra,* the court, in construing section 11 of the enabling act of that state, which is identical with section 5 of the Idaho admission act, after reciting the different land grants made to said state by Congress, said: ''It is entirely clear from all the provisions of the enabling act just quoted that the entire grant of lands to the state for educational purposes was in trust, and that the express terms of the grant require the state, as trustee, to maintain the permanency of the funds so granted. And, further, that it limits the state to the use of the interest of the permanent fund, and requires that such interest shall be used only for the support of schools.''

In *Stein v. Morrison,* 9 Idaho, 426, 75 Pac. 246, this court, when discussing the state debt limitations as imposed by the constitution, said: ''A large portion of the remaining indebtedness, however, is not an obligation against the state to be met by taxation or any other method of raising revenue, but is payable out of the interest from permanent funds derived from donations made by the general government upon our admission as a state.'' In that case it was not contended that the indebtedness then referred to could not be met and paid out of the income of the permanent school fund. It was apparently admitted in that case that such indebtedness was a valid and subsisting indebtedness—at least unless it exceeded the state indebtedness as limited by the constitution. In that case the right to use the income from the permanent school fund in payment of bonds and interest was not even mooted. What was there said by the court was based upon the assump-

tion, apparently common to counsel on both sides of the case, that the legislature had authority to issue bonds payable out of said funds, and that therefore no tax levy was necessary to meet them, and consequently no state debt was created thereby as limited and defined by the constitution. Again, the language there used was rather made by way of argument, as it was held that the aggregate amount did not reach the debt limit. The court did not intend in the above quotation to pass upon the authority of the legislature to make the principal or interest of the bonds referred to in that case payable out of the income arising from the permanent school fund. The debt limit as provided by the constitution was the main point in that case.

Our state constitution was adopted some time before the Idaho admission bill was passed, and for that reason we find no direct acceptance therein of any land grants made to the state for educational purposes, but, of course, in our admission as a state, the terms of such grants as therein provided had been accepted by the state, and the provisions of section 4, article 9 of our constitution are broad enough to include all grants for educational purposes, and after declaring of what moneys the public school fund of the state shall consist, said section provides, *inter alia,* "that all other grants of land or money made to the state from the general government for educational purposes shall constitute the public school fund." The public schools of this state include the little log cabin in the remote district, as well as the magnificent normal schools, the academy and the state university. The university is as much a public school as is the district school.

The supreme court of Kansas in the case of *State v. Board of Regents of the State University,* 55 Kan. 389, 40 Pac. 656, 22 L. R. A. 378, in discussing the powers and duties of the board of regents, and the mission of the State University as only public schools, that court said: "We are unable to mention another corporation in whose keeping interests are confided which it is more appropriate to protect by the exercise of the power of the court than those confided in the regents.

The education of the youth by the public is, of all the powers exercised by the state, the most certain and unalloyed benefit to the people. The university crowns the great public school system.'' And so the University of Idaho crowns the great public school system of our fair young state. Of course we have in the United States many universities that have no connection whatever with the state government in which they are located, but such is not the case with the State University of Idaho, as the Idaho University is under the control and direction of the state. If the income derived from the investment of the permanent school funds of the state could be used for the erection of buildings, then, of course, the support and maintenance of such schools must be provided for by direct taxation. The Congress by its munificent gift of lands, endowed the public schools of the state with a permanent fund, the income from which can only be used in the support of the schools, and not in the erection and equipment of school buildings.

It is shown by several acts passed by the legislature of the state during the past several years that an effort has been made to appropriate not only the interest and income of the permanent school fund, but a part of the fund itself, for the payment of bond issues, the proceeds of which bonds have been used in the erection and equipment of school buildings.

In addition to the act under consideration, the legislature at its last session passed an act entitled ''An act creating and establishing the university fund, providing that moneys received into the state treasury from certain sources shall be placed in and constitute such fund, and appropriating all of the moneys credited thereto for the support and maintenance of the university.'' (Sess. Laws 1905, p. 417.) The second section of said act is as follows: ''That no moneys shall ever be appropriated out of the university fund for any purpose other than the support and maintainance of the university, nor shall any moneys properly belonging to the said fund ever be diverted therefrom for any other purpose whatsoever.'' It will thus be seen that the legislature undertook to appropriate a part of the income from such fund for the

payment of the bonds under consideration and the accruing interest thereon, and also by the last-mentioned act appropriated the entire interest and income from such fund for the support and maintenance of the university; and by the fourth section of said act made such appropriation perpetual. I only refer to this matter to show that the legislature at its last session undertook to appropriate a part of such income for the payment of said bonds and interest, and also appropriated the whole of such income for the support and maintenance of the university. This probably was an oversight. However, the tendency has been to encroach upon the public school fund and divert it from the purposes for which it was created.

I must therefore conclude that the legislature had no power or authority to appropriate or set apart for the payment of the interest or principal of the bonds referred to any part of the proceeds of the permanent fund created by the sale of the whole or any part of said seventy-two sections of land or the timber thereon. That being true, the act under consideration is unconstitutional and void, because it fails to provide any means for the payment of the interest or debt that would be created by the issuance of such bonds. The demurrer must be sustained and the writ denied. No costs are awarded.

Stockslager, C. J., concurs.

Ailshie, J., concurs in the conclusion reached.