The **OKLAHOMA EDUCATION ASSOCIATION, INC.**, Petitioner,

v.

The Honorable George **NIGH**, Spencer Bernard, Tom Daxon, Leslie Fisher and Jack Craig, as Commissioners of the Land Office, Respondents.

No. 57361.

Supreme Court of Oklahoma.

Feb. 16, 1982.

Rehearing Denied March 30, 1982.

---

Karen L. Long, Gen. Counsel, Oklahoma Ed. Ass'n, Inc., Oklahoma City, for petitioner.

Jan Eric Cartwright, Atty. Gen., Neal Leader, Asst. Atty. Gen., Oklahoma City, for intervenor/petitioner, Atty. Gen. of Okl.

Keith McMillin and John E. Montazzoli, Kornfeld, McMillin, Phillips & Upp, Oklahoma City, for respondents.

Lana Jeanne Tyree, Oklahoma City, for intervenors, Independent School Districts # 41, # 12 and # 52 of Oklahoma County, and Independent School Dist. # 20 of LeFlore County, Okl.

William P. Bleakley, Groves, Bleakley & Tague, Oklahoma City, for intervenors, Independent School Dist. # 89 of Oklahoma County, and Vocational-Technical School Dist. # 22 of Oklahoma County, Okl.

Phil A. Daugherty and R. Steven Haught, Oklahoma City, for intervenors/respondents, R. H. James, et al.

Ernest F. Godlove, Godlove, Joyner, Meyers & Mayhall, Inc., Lawton, for intervenors, Earl Glover, et al.

BARNES, Vice Chief Justice:

This Court has assumed original jurisdiction of Case No. 57,361 for the sole purpose of considering the constitutionality of 64

O.S. 1971, § 86.1, § 89, 64 O.S.Supp. 1979, § 52(c), 64 O.S.Supp. 1974, § 100, and 64 O.S.Supp. 1976, § 260.2.[1]

Petitioners contend that these statutes prohibit the Respondents, Commissioners of the Land Office, from complying with the terms and purposes of the Oklahoma Enabling Act,[2] Act of Congress June 16, 1906, 34

1. 64 O.S. 1971, § 86.1:
"The Commissioners of the Land Office when leasing or re-leasing preference right lands shall charge and collect therefor an annual rental equal to three percent (3%) of the fair cash market value thereof, exclusive of improvements, as determined and fixed by the appraisal of such lands under the provisions of Section 86, Title 64, Oklahoma Statutes, 1951, provided that the Commissioners of the Land Office may, whenever the market value of the land is greater than its market value for the purpose for which it is being leased, charge and collect an annual rental of not less than three percent (3%) of the value of the land for the purpose to which it is or may be devoted under the terms of the lease. Every lease shall specify and limit the purpose for which the land shall be used, and no improvements or structures not necessary for the use of such land for agricultural or grazing purposes shall be placed thereon. No lease authorizing the use of such land for purposes other than agriculture and grazing shall operate to ratify the previous action of any lessee who may have erected structures and improvements for purposes other than agriculture and grazing, and no such lease shall extend for a term of more than two (2) years."
64 O.S. 1971, § 89:
"Preference right lease lands shall be rented by the Commissioners of the Land Office for terms of five years at an annual rental of four per centum (4%) of the appraised value of such lands exclusive of improvements. Provided, however, if in the opinion of the Commissioners of the Land Office, four per centum (4%) is too high, then, on proper showing the rental may be reduced to not less than two per centum (2%) by the Commissioners of the Land Office. The land departmental appraisement of such lands shall be the basis of rental and including the year 1935, or until said lands be appraised again, which the Commissioners of the Land Office are directed to do during the year 1935, and in no event later than the month of September, 1936."
64 O.S.Supp. 1979, § 52(c):
"(c) All farm loans made by the Commissioners of the Land Office of the State of Oklahoma from the trust funds under their jurisdiction and control, as otherwise provided by the laws of this state, shall bear interest at the rate of

eight and one-half percent (8½%) per annum, payable annually or semiannually, until paid. All delinquent installments, both principal and interest, shall bear interest at a rate of ten percent (10%) per annum until paid. All such loans shall be paid in the manner and within such period of time as may be required by the Commissioners of the Land Office; provided, the entire amount of any loan shall be paid within a period of not to exceed thirty-three (33) years from the date of the loan. Provided, further, that persons receiving fifty percent (50%) or more of their total annual income from the operation of a farm shall be given preference by the Commissioners in approval of any loans made under the provisions of this act."
64 O.S.Supp. 1974, § 100:
"The balance of the purchase price of any and all lands sold by the Commissioners of the Land Office after the effective date of this act under sales contract shall bear interest at the rate of seven and one-half percent (7½%) per annum. All delinquent installments, both principal and interest, shall bear interest at the rate of ten percent (10%) per annum until paid."
64 O.S.Supp. 1976, § 260.2:
"Every lessee holding a preference right lease on agricultural or grazing lands who, after appraisement for rental purposes, desires to renew said lease covering the same tracts of land shall make application to the Commissioners of the Land Office for a new lease on or before October 1 next preceding the expiration of the term of his existing lease. All other applicants for a lease on said land shall make proper application on or before November 1 next preceding the expiration of such existing lease. If the current lessee has in good faith complied with all requirements of his existing lease to the satisfaction of the Commissioners of the Land Office, the new lease shall be awarded to said current lessee, if the Commissioners decide that said land be leased."

2. Oklahoma Enabling Act, Act of Congress June 16, 1906, 34 U.S. St. at Large, pp. 267–278, provides in pertinent part:
"§ 7. That upon the admission of the State into the Union sections numbered sixteen and thirty-six, in every township in Oklahoma Ter-

U.S. St. at Large, pp. 267–278, §§ 7, 8, 9, and 10, which established this State's School Land Trust, and said statutes prohibit Respondents from complying with the duties

ritory and all indemnity lands heretofore selected in lieu thereof, are hereby granted to the State for the use and benefit of the common schools...

\* \* \* \* \* \*

"§ 8. That section thirteen in the Cherokee Outlet, the Tonkawa Indian Reservation and the Pawnee Indian Reservation; reserved by the President of the United States by proclamation issued August nineteenth, eighteen hundred and ninety-three, opening to settlement the lands, and by any Act or Acts of Congress since said date and section thirteen in all other lands which have been or may be opened to settlement in the Territory of Oklahoma, and all lands heretofore selected in lieu thereof, is hereby reserved and granted to said State for the use and benefit of the University of Oklahoma and the University Preparatory School, one-third; of the normal schools now established or hereafter to be established, one-third; and of the Agricultural and Mechanical College and Colored Agricultural Normal University, one-third...

"That section thirty-three, and all lands heretofore selected in lieu thereof, heretofore reserved under said proclamation, and Acts for charitable and penal institutions and public buildings, shall be apportioned and disposed of as the Legislature of said State may prescribe.

"Where any part of the lands granted by this Act to the State of Oklahoma are valuable for minerals, gas and oil, such lands shall not be sold by the said State prior to January first, nineteen hundred and fifteen; but the same may be leased for periods not exceeding five years by the State officers duly authorized for that purpose, such leasing to be made by public competition after not less than thirty days advertisement in the manner to be prescribed by law, and all such leasing shall be done under sealed bids and awarded to the highest responsible bidder. The leasing shall require and the advertisement shall specify in each case a fixed royalty to be paid by the successful bidder, in addition to any bonus offered for the lease, and all proceeds from leases shall be covered into the fund to which that shall properly belong, and no transfer or assignment of any lease shall be valid or confer any right in the assignee without the consent of the proper State authorities in writing: Provided, however, that agricultural lessees in possession of such lands shall be reimbursed by the mining lessees for all damage done to said agricultural lessees' interest therein by reason of such mining operations. The Legislature of the State may prescribe additional legislation governing such leases not in conflict herewith.

\* \* \* \* \* \*

imposed upon them as managers of this trust (the State being the Trustee) under Article XI, Section 1, Section 2, and Section 5 of the Oklahoma Constitution.[3] There-

"9. That said sections sixteen and thirty-six, and lands taken in lieu thereof, herein granted for the support of the common schools, if sold, may be appraised and sold at public sale in one hundred and sixty acre tracts or less, under such rules and regulations as the Legislature of the said State may prescribe, preference right to purchase at the highest bid being given to the lessee at the time of such sale, the proceeds to constitute a permanent school fund the interest of which only shall be expended in the support of such schools. But said lands may, under such regulations as the Legislature may prescribe, be leased for periods not to exceed ten years; and such lands shall not be subject to homestead entry or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for school purposes only.

\* \* \* \* \* \*

"10. That said sections thirteen and thirty-three aforesaid, if sold, may be appraised and sold at public sale, in one hundred and sixty acre tracts or less, under such rules and regulations as the Legislature of said State may prescribe, preference right to purchase at the highest bid being given to the lessee at the time of such sale, but such lands may be leased for periods of not more than five years, under such rules and regulations as the Legislature shall prescribe, and until such time as the Legislature shall prescribe such rules these and all other lands granted to the State shall be leased under existing rules and regulations, and shall not be subject to homestead entry or any other entry under the land laws of the United States, whether surveyed or unsurveyed, but shall be reserved for designated purposes only, and until such time as the Legislature shall prescribe as aforesaid such lands shall be leased under existing rule..."

3. Article XI, Section 1, Oklahoma Constitution, provides in pertinent part:

"The State hereby accepts all grants of land and donations of money made by the United States under the provisions of the Enabling Act ... and the faith of the State is hereby pledged to preserve such lands and monies and all monies derived from the sale of any of said lands as a sacred trust and to keep the same for the uses and purposes for which they were granted or donated."

Article XI, Section 2, Oklahoma Constitution, provides in pertinent part:

"... The principal shall be deemed a trust fund held by the State and shall forever remain inviolate. It may be increased but shall never be diminished. The State shall reimburse said

fore, Petitioners contend that these said statutes are unconstitutional.

■ Two of the statutes, 64 O.S. 1971, § 86.1 and § 89, established maximum rents which the Commissioners can charge when leasing preference right land. The first statute limits the rent to but three percent of the land's fair market value and the second limits the rent to between two percent and four percent of the land's value.[4]

Two statutes, 64 O.S.Supp. 1979, § 52(c), and 64 O.S.Supp. 1974, § 100, limit the amount of interest which the Commissioners can charge in making farm loans, and when selling trust property. Section 52(c) limits the interest on farm loans to eight and one-half percent, while Section 100 limits the interest that can be charged on the purchase price of trust land, setting such interest rate at seven and one-half percent.

The last statute being challenged, 64 O.S. Supp. 1976, § 260.2, establishes a preference right to re-lease trust lands, requiring the Commission, when the land is to be re-leased, to award the lease to the current lessee if he has in good faith complied with the requirements of his existing lease without requiring the current lessee to exceed or match other bids.

■ The School Lands Trust, administered by the Commissioners of the Land Office, for the State as Trustee, consists of certain lands and funds granted to the State of Oklahoma upon its admission into the Union by the Enabling Act. The gift of these lands and funds under the Enabling Act was accepted irrevocably by the people of Oklahoma, and such acceptance was set out in the Oklahoma Constitution under Article XI, Section 1. These acceptance provisions of the Oklahoma Constitution and the Enabling Act constitute an irrevocable compact between the United States and Oklahoma, for the benefit of the common schools, which cannot be altered or abrogated.[5] No disposition of such lands or funds can be made that conflict either with the terms and purposes of the grant in the Enabling Act or the provisions of the Constitution relating to such land and funds.[6] The State has an irrevocable duty, as Trustee, to manage the trust estate for the exclusive benefit of the beneficiaries, and return full value from the use and disposition of the trust property.[7] The express

permanent school fund for all losses which may in any manner occur, and no portion of said fund shall be diverted for any other use or purpose."
Article XI, Section 5, Oklahoma Constitution, provides in pertinent part:
"... Said lands ... or the proceeds of the sale thereof shall be safely kept or invested and preserved by the State as a trust, which shall never be diminished, but may be added to, and the income thereof, interest rentals or otherwise, only shall be used exclusively for the benefit of said educational institutions..."

4. Respondents argue that Section 86.1 and Section 89 were repealed by implication when the Legislature enacted 64 O.S. 1971, § 259, which provides:
"Any lands leased by the Commissioners of the Land Office for agricultural and for grazing purposes shall be leased for a period not to exceed five years under such terms and conditions and as such annual rental as may be fixed by the Commissioners of the Land Office."
Repeal of statutes by implication is not favored and will not be indulged if there is any other reasonable construction which will allow all statutes concerned to be given effect. The pro-

visions of Section 259 provide that the Commissioners are to fix the annual rental, while the provisions of the challenged statutes provide the method for fixing said rates.

5. *State of Oklahoma ex rel. Mac Q. Williamson v. Commissioners of the Land Office*, 301 P.2d 655 (Okl.1956), provided that: "... said regulations [in the Oklahoma Enabling Act] exist as valid laws of the United States, which may not be modified, restricted or changed by an Act of the Oklahoma Legislature or the people of Oklahoma in amendment of the Oklahoma Constitution."

6. *Lassen v. Arizona*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967); *Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976); *United States v. 78.61 Acres of Land in Dawes and Sioux Counties, Nebraska*, 265 F.Supp. 564 (D.Neb.1967); *Anderson v. Board of Educational Lands & Funds*, 198 Neb. 793, 256 N.W.2d 318 (1978).

7. *Lassen v. Arizona*, supra; *United States v. Fenton*, 27 F.Supp. 816 (S.D.Idaho (1939)); *Roach v. Gooding*, 11 Idaho 244, 81 P. 642 (1905); *State Highway Commission et al v.*

designation of the school lands and funds as a "sacred trust" has the effect of irrevocably incorporating into the Enabling Act, Oklahoma Constitution, and conditions of the grant, all of the rules of law and duties governing the administration of trusts.[8]

■ No Act of the Legislature can validly alter, modify or diminish the State's duty as Trustee of the school land trust to administer it in a manner most beneficial to the trust estate and in a manner which obtains the maximum benefit in return from the use of trust property or loan of trust funds.[9]

■ Petitioners allege that the below-market statutorily set interest and rents, the uneconomical re-leasing rights, inure only to the benefit of farmers and ranchers. Petitioners urge that the income ceilings and re-leasing rights serve only one purpose, that of subsidizing farming and ranching operations. We agree with this contention.[10] Just as a State may not use school land trust funds assets to subsidize its highway construction program, a State may not use school land trust assets to subsidize farming and ranching.[11] The use of trust fund assets for the purpose of subsidizing farmers and ranchers is contrary to the provisions of the Oklahoma Constitution, and to the provisions of the Oklahoma Enabling Act.

Said statutes interfere with the duty of the State as Trustee to maximize the return to the trust estate. The Supreme Court, in *Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 303, 96 S.Ct. 910, 916, 917, 47 L.Ed.2d 1, 8, 10 (1976), stated:

"The trust is to receive at the time of its disposition of any interest in the land, the then full value of the particular interest which is being dispensed.... Thus, if the lease of trust lands calls for rental of substantially less than the land's fair rental value, it is null and void...."

Similarly, in the case of *State ex rel. Ebke v. Board of Educational Lands & Funds*, 154 Neb. 244, 47 N.W.2d 520 (1951), the Supreme Court of Nebraska was asked to determine the constitutionality of legislative restrictions on trust management. While recognizing that the Legislature had the authority to establish rules and regulations for the trust, the Court held that the Legislature could do so only insofar as they did not violate the State Constitution. The Supreme Court of Nebraska held that the trust was "subject to the rules of law applicable to the handling of trust estates because of the status assigned to the trust by the Constitution." The Court held that:

"A Trustee is required to dispose of trust property upon the most advantageous terms which is possible for them to secure for the benefit of the cestui que trust whom he represents. The rule is no different in the leasing of property of a trust estate. A trustee is required to accept the highest bid in the absence of cogent reasons for not doing so. It is a breach of trust for a trustee to knowingly handle the property of a trust estate for the benefit of any person at the expense of the trust estate.... It is a fundamental principle that a Trustee owes beneficiaries of a trust his undivided loyalty and good faith, and all his acts as such Trustee must be in the interest of the

---

State, 70 N.D. 673, 297 N.W. 194 (1941); *Special School District No. 5 v. State*, 139 Ark. 263, 213 S.W. 961 (1919); *Popp v. Munger*, 131 Okl. 282, 268 P. 1100 (1928).

8. *State v. Phillips Petroleum Co.*, 258 P.2d 1193 (Okl.1953); *State ex rel Ebke v. Board of Educational Lands & Funds*, 154 Neb. 244, 47 N.W.2d 520 (1951).

9. *Lassen v. Arizona*, supra; *Anderson v. Board of Educational Lands & Funds*, 198 Neb. 793, 256 N.W.2d 318 (1978).

10. We are not saying that under proper circumstances a preference right to release trust lands requiring the current lessee to equal or exceed other bids cannot be given. We are merely saying that a preference right to re-lease given to the current lessee that does not require payment of a competitive rate for such lease is violative of the trustee's duty to obtain the maximum benefit and return to the trust estate.

11. *Lassen v. Arizona*, supra; *United States v. 78.61 Acres of Land in Dawes and Sioux Counties, Nebraska*, supra.

cestui que trust and to no one else. . . . The State in acting as a Trustee is subject to the same standards, and when its status as a Trustee is fixed by the Constitution a violation of its duty as a Trustee is a violation of the Constitution itself." 47 N.W.2d 520, at 523.

Thus, the Supreme Court of Nebraska found that the alleged right to "re-lease" school lands without regard to other bids was unconstitutional and violative of the Federal grant.

■ Respondents contend that the assailed legislative enactments are expressly ordained by Sections 9 and 10 of the Enabling Act and therefore cannot be constitutionally impermissible. The argument is that the literal language of the Act vests in the Legislature the authority to enact practically any rule or regulation it chooses with regard to selling or leasing the federally granted land.[12]

The speciousness of this position is that it reads the selected language in isolation from the entire contextual content of the relevant sections. Common sense dictates, when the land gift provisions of the Enabling Act are read as a whole, that this was not the intent or purpose behind Sections 9 and 10. Nor could it logically be. For if Respondents are correct, then a potentially self-defeating incompatibility exists between the stated purpose and objective of the trust on the one hand, and the alleged unbridled authority granted the State Legislature to defeat that strategy by means of creative rules and regulations on the other hand.

■ Of course, the natural question to ask is, why or for what reason did the framers of the Enabling Act authorize the Legislature to make rules and regulations to govern the administration of the trust? An analysis of the language employed in the Enabling Act provides a rather clear answer—the intent was to vest authority in the Legislature to establish statutory rules and regulations designed to (1) attain the trust goals—protection of assets coupled with maximum return; and (2) provide standards to foster even-handed and proper administration of the trust.

In Section 8 of the Enabling Act, for instance, the intent is explicit. After specifying that all mineral leasing of school lands must be by "sealed bids and awarded to the highest responsible bidder," the section says that the "Legislature of the State may prescribe additional legislation governing such leases *not in conflict* herewith." [Emphasis added]

And, Section 9, dealing with the subject of selling trust land, requires the land to "be appraised and sold at public sale . . . , preference right to purchase at the highest bid given to the lessee at the time of sale. . . . " These land sales are to be conducted "under such rules and regulations as the Legislature of the said State may prescribe. . . . " Similar language appears in Section 10. When considered in the context of the overall text, there can be no doubt that the rule making authority granted the Legislature was intended to promote rather than impede attainment of the manifest objective of the Enabling Act provisions, viz., to assure realization of maximal rents, profits and returns from the trust estate for the benefit of the school children of this State.

■ It is also the contention of Respondents that considerations of conservation and waste enter into the situation and that the attainment of a maximum return to the trust is not a controlling factor. In this respect, we point out that the primary purpose of the trust is the production of income for the support and maintenance of the common schools of the State. Article XI, Section 1, Constitution of Oklahoma. While it is true that reasonable precaution should be taken for the protection of the property within the trust, this does not mean the

---

**12.** This same thing cannot be argued with regard to loaning trust funds at below market interest rates. That contention has to be based on a similar State constitutional provision. See Article XI, Section 6. The answer, in principal, is the same as that given to the enabling Act contention.

question of income becomes an unimportant factor. Conservation necessary to protect the value of the lands leased can be adequately controlled by lease provisions and conditions, and by reasonable conservation regulations imposed by Respondent Board.

■ Respondents also argue that the investment preferences contained in Article XI, Section 6, of the Oklahoma Constitution,[13] justify and require these statutory income restrictions which benefit farmers and ranchers. No such justification can be found in this constitutional provision. We find that the proper interpretation of said section requires that preference be given to the investments in the order in which they appear, as long as such preference does not prevent the State as Trustee from fulfilling its duty to obtain the maximum return from the trust property under its control, exercising ordinary prudence and subject to the taking of necessary precautions for the preservation of the trust estate.[14] The constitutional provision nowhere provides that, in addition to the preference, farmers and ranchers are to be given rental discounts, or, because of the preference, they should be able to borrow trust funds at below market interest rates.

■ For the above stated reasons, we hold that the challenged statutes require management of trust funds and property in a manner inconsistent with the terms of the original grant, requiring Respondents to violate their duties as managerial trustees of the School Land Trust, and therefore violate the provisions of Article XI, Section 1, Section 2, and Section 5 of the Oklahoma Constitution, and the Oklahoma Enabling Act, Act of Congress June 16, 1906, 14 U.S. St. at Large, pp. 267–279, Sections 7, 8, 9, and 10. While the Legislature does have the power to, and may, regulate the activities of the Commissioners, it can neither abridge nor impair their freedom to function in utmost good faith in the day-to-day discharge of their public obligation as managers of the trust estate and while acting on behalf of the State as Trustee.

Respondents also raise the question of whether the Attorney General is empowered to determine what procedures and policies the Respondents should follow, absent valid legislative occupation of the field. Article VI, Section 32, of the Oklahoma Constitution,[15] charges Respondents with the sale, rental, disposal and managing of the school lands and funds under rules and regulations of the Legislature. Until such time as the Legislature promulgates new statutes concerning the subject matter, the Commissioners of the Land Office are mandated by the Oklahoma Constitution to use their powers so enumerated therein, and are further mandated, pursuant to this opinion,

13. Article XI, Section 6, of the Oklahoma Constitution, provides in part:

"The permanent common school and other educational funds shall be invested in first mortgages upon good and improved farm lands within the state (and in no case shall more than fifty per centum (50%) of the reasonable valuation of the lands without improvements be loaned on any tract), Oklahoma State bonds, county bonds of the counties of Oklahoma, school district bonds of the school districts of Oklahoma, promissory notes evidencing federal and state insured loans made to students under any federal or State of Oklahoma insured student loan program, and United States bonds, preference to be given to the securities in the order named. The said funds may also be invested in deposits in banks or trust companies in Oklahoma to the extent such deposit is insured by the Federal Deposit Insurance Corporation.

"The Legislature shall provide the manner of selecting the securities aforesaid, prescribe the

rules, regulations, restrictions, and conditions upon which the funds aforesaid shall be loaned or invested, and do all things necessary for the safety of the funds and permanency of the investment."

14. *Pipkin v. Pipkin*, 393 P.2d 534 (Okl.1964); *State v. Peterson*, 156 Neb. 678, 57 N.W.2d 280 (1953).

15. Article VI, Section 32, of the Oklahoma Constitution, provides in part:

"A. The Governor, Lieutenant Governor, State Auditor, Superintendent of Public Instruction, and the President of the Board of Agriculture shall constitute the Commissioners of the Land Office, who shall have charge of the sale, rental, disposal and managing of the school lands and other public lands of the state, and of the funds and proceeds derived therefrom, under rules and regulations prescribed by the Legislature."

to prudently exercise their duty to maintain the maximum return to the trust estate from the trust properties under their control, subject, of course, to the taking of necessary precaution for the preservation of the trust estate.

 Lastly, Respondents and those citizens dealing with Respondents have heretofore acted under authority of the subject statutes, believing such statutes to be valid law. While it has often been stated in general terms that an unconstitutional statute confers no rights, creates no liability, and affords no protection,[16] there are well recognized exceptions to this general rule. An unconstitutional law should not be applied to work a hardship or impose liability on a public official or citizen who acted in good faith and relied on the validity of a statute before courts have declared it invalid, or until advised by proper officials of its unconstitutionality.[17] In order to protect Respondents and the citizens dealing with them in good faith, under the facts of this case, we hold that Respondents and citizens are hereby protected from any liability for any retrospective acts committed under said unconstitutional statutes because of their unconstitutionality, and our decision invalidating said statutes will operate prospectively from the date this opinion becomes final.

CHARLES WILSON, S. J., sitting in place of IRWIN, C. J., who disqualified.

BRIGHTMIRE, S. J., sitting in vacancy.

HODGES and LAVENDER, JJ., concur.

OPALA, J. concurs in part, dissents in part.

SIMMS, DOOLIN and HARGRAVE, JJ., dissent.

**16.** *Norton v. Shelby County,* 118 U.S. 425, 6 S.Ct. 1121, 30 L.Ed. 178.

**17.** *Board of Com'rs of Pottawatomie County v. A. C. Davis & Sons,* 184 Okl. 258, 86 P.2d 782 (1939); *Gordon v. Conner,* 183 Okl. 82, 80 P.2d 322 (1938); *Wade v. Board of Com'rs of Harmon County,* 161 Okl. 245, 17 P.2d 690 (1933); *Provident Land Corp. v. Provident Irrig. Dist.,* Cal.App., 94 P.2d 83 (1939); *Shafford v.*

SIMMS, Justice, dissenting:

I must dissent. We have no facts before us in this action. A majority of the Court voted to assume jurisdiction of this matter without any factual determination having been made or any stipulation of facts agreed on, for the "sole purpose" of deciding the constitutionality of five statutes. I dissented to taking jurisdiction of this cause as it was framed, or more accurately—as it was not framed—and I believe the problems inherent in a decision rendered in the abstract are evident from the face of the majority opinion.[1]

The opinion is not based on proven facts, but on assumptions of facts which may or may not be valid or accurate. Some of those assumptions are:

(1) The Commissioners of the Land Office do not charge more than 3% of the appraised value of land for agricultural leases;

(2) Leases for "but 3%" of appraised value are not bringing the trust a good and fair return on its land;

(3) The Commissioners do not require competitive bidding in leasing, and in fact cannot require bidding under the statutes.

These things may or may not be true. We do not know how the Commissioners lease land or how they establish rental price. We also do not know what a "good" lease rate is for agricultural land. It may be that 3% is a very fair return for land of this type. It may also be that the financial loss, if any, to the trust results not from the statutory rental provisions, but from the method and manner of appraising the land.

No less important is the fact that the majority's opinion on the constitutionality

*Brown,* 49 Wash. 307, 95 P. 270 (1908); *State v. Village of Garden City,* 74 Idaho 513, 265 P.2d 328 (1953).

**1.** A more thorough discussion of the problems presented by deciding questions in this manner can be found in the dissenting opinion in *Okla. Ass'n. of Municipal Attorneys v. State,* Okl., 577 P.2d 1310, 1315 (1978).

of these statutes ignores all relevant rules controlling that decision making process. It is axiomatic that statutes are presumed to be constitutional and the burden of showing the unconstitutionality rests on the party asserting it. Also that where a statute is capable of two constructions, one which would render it invalid and the other valid, the construction which will uphold its validity must be adopted. The cardinal rule in the construction of statutes is that the legislative intent must govern, and to ascertain that intent all the various portions of the legislative enactments upon the particular subject, should be construed together in light of the general purposes of the Act and given effect as a whole. Additionally, when a statute is susceptible of two interpretations, that one giving it effect intended by the legislature should be adopted. None of this was done in this case.

I do not agree with the majority's determination that 64 O.S.1971, § 86.1 establishes a *maximum* lease-value rate of 3%. Another statutory provision reveals the clear legislative demand that 3% is a *minimum*, not maximum, rental rate. 64 O.S.1971, § 87a(g) provides in pertinent part:

> "... Such appraisment shall be used and followed by the Commissioners of the Land Office in fixing the annual rental value of all such preference right lease lands and all such lands may be leased by the Commissioners of the Land Office for a term of five years, at an annual rental of *not less than* three per cent (3%) of the appraised value of such lands, exclusive of improvements."

Words can be supplied or modified by the Court to give a statute the effect intended by the legislature. See, e.g., *Curtis v. Registered Dentists of Oklahoma*, 193 Okl. 233, 143 P.2d 427 (1943). Gathering the intent of the legislature from all the enactments—assuring adequate income to the trust by requiring a minimum rate of 3%—the provision of § 86.1 can, and should, be read to require "rental equal to *at least* 3%", consistent with § 87a(g).

The majority rejects the Commissioner's argument that § 259 repealed § 86.1 and § 89 by implication, based on the rule that repeals by implication are not favored and will not be indulged if another reasonable construction will allow all statutes to be given effect. I do not believe that being stricken for unconstitutionality is being "given effect" within the contemplation of the rule. I would not find § 86.1 repealed, but would, as discussed above, hold that it requires a minimum rental of 3%. I would hold that § 89 was repealed by implication. I would find that the statute which impliedly repealed it was § 87a(g) however, not § 259.

Section 89 was enacted in 1935 (Laws 1935, p. 116, § 25) and § 87a(g) in 1941. (Laws 1941, p. 299) The differences between the two sections cannot be reconciled. They cannot be construed harmoniously as § 86.1 and § 87a(g) can be, because the specific provisions are in conflict. Section 89 provides for rent floating between 2% and 4%, and § 87a(g) for a minimum rent of 3%.

The majority assumes that competitive bidding will allow the trust a fair rate of return commensurate with the market value of the property and strikes §§ 86.1 and 89 because, in the majority's view, they prohibit bidding and limit potential return by imposing a percentage ceiling.[2]

Even taking these things as true, still under the majority's own reasoning, its striking of § 260.2 for its failure to also expressly require competitive bidding is unnecessary. Section 260.2 does not contain any method of establishing lease price. It is wholly dependent upon the provisions for appraisal and determination of percentage rental price stricken by the majority for failure to require bidding. Using its own analysis, the majority has already cured the problem of absence of statutory requirement for competitive bidding by striking §§ 86.1 and 89, but strikes § 260.2 anyway. The requirement for bidding imposed by

2. It should be noted that while it has not been mentioned, rental procedures for commercial leases (64 O.S.1971, § 195) also are included in the majority's holding.

this opinion, of necessity, will carry over and be added as a separate and necessary prerequisite to obtaining a preference lease.

In my view, striking § 260.2 is also unnecessary for a different reason. The Commissioners are fully empowered to do just what they did: adopt the requirement for competitive bidding on leases by rule. The statutes do not limit the authority of the Commission, a constitutionally created body, to implement those rules necessary to protect the trust and prudently manage the leasing and income therefrom. To the contrary, §§ 259 and 260 provide:

"Any lands leased by the Commissioners of the Land Office for agricultural and/or grazing purposes shall be leased for a period not to exceed five years under such terms and conditions and at such annual rental as may be fixed by the Commissioners of the Land Office." 64 O.S.1971, § 259.

"The Commissioners of the Land Office are hereby authorized and empowered to make and promulgate rules and regulations relating to the appraisement of land and any improvements located upon such land as may be owned by the State, leasing and subleasing such lands and improvements, reservation of rights and interests, collection of rentals, conservation and preservation of such lands and the fertility thereof and any other rules and regulations necessary in order that the purposes for which such lands are owned and held by the State may be accomplished." 64 O.S.1971, § 260.

Given the majority's position that the statutes actually prohibit a competitive bidding requirement for leasing, it is unnecessary to set out the plan the Commissioners did adopt and examine it.

The point is not what the plan says, but the fact that there is a plan. That plan, it occurs to me, rather than the constitutionality of these statutes, should be the focal point of this action. If adequate, it would render this matter moot (assuming it was ever viable). Instead it goes unmentioned.

Assume that prior to this action being filed, an unhappy lessee had brought an action complaining about the Commissioners' adoption of the competitive bidding requirements, asserting the Commissioners had no power to do so. I doubt that the Court would have sustained that position. This Court certainly rejected such a contention in a similar case in *State, ex rel., Commissioners v. Wall*, 204 Okl. 665, 232 P.2d 940 (1951). There a lessee contended that the Commissioners did not have the power or authority to appraise lands without being expressly and specifically directed to do so by the legislature. Various statutory provisions (including §§ 86.1 and 89) were examined and it was held that specific direction to appraise and reappraise land was not necessary to confer such power on the Commissioners. The Court stated:

"A careful study of the various acts of the legislature, and the constitutional provision above set forth, convinces us that the power of appraisal of state lands, in order to arrive at the amount of a reasonable rental therefor, was a necessary incident to the management, leasing, and disposal of said lands vested in the Commissioners of the Land Office by [art. 6, sec. 32] . . ."

\* \* \* \* \* \*

"It is inconceivable to us that a commission composed of five of the highest officials of the state, entrusted with the duty of managing said lands to effectuate the purposes for which they were granted to the state, that is, to provide funds for the use of the common schools of the state, should be so hampered and restricted in management and operation of such properties that they were not permitted to place a valuation upon the lands for the purpose of renting them for agricultural purposes unless they were expressly authorized to do so by the legislature. We find nothing in the Constitution or laws of the state prohibiting the exercise of such power by the Commissioners, and as above stated, it was necessarily incident to the proper performance of their trust. By the exercise of this power the state is assured of adequate rentals on the leased lands, regardless of the fluctuating value thereof." 232 P.2d at 943–944.

Likewise, providing for bidding procedures is a necessary incident to the management and leasing powers vested in the Commissioners by art. 6, sec. 32.

I disagree with the majority's conclusion that the statutes prohibit competitive bidding. I find the statutes, when properly construed, are clearly compatible with a competitive bidding requirement implemented by the Commissioners, and that the statutes recognize such power vested in the Commissioners. I would hold that consistent with §§ 259 and 260, the Commissioners exercised their vested power to create leasing procedures they deemed most beneficial to the trust. As concluded by the majority, competitive bidding or competitive bonus offers would be compatible with the statutes and function of the trust.

I would hold that §§ 86.1 and 87a(g) impose a minimum income requirement on rental, so that whatever procedure for establishing rent is used, the Commissioners must receive a minimum rate of at least 3% of the value of the land they lease. Section 260.2 need not be stricken; the rental provisions of the other statutes control that requirement.

Preference right leases may not even be a real problem. There may not be such a thing any longer. More than slight doubt is cast on their continued viability by 64 O.S. Supp.1977, § 253(D), which provides:

"Hereafter no preference right lease may be created by the School Land Commission."

Perhaps, then every preference right to re-lease is extinguished when the lease period expires and much of this lawsuit has been over nothing.

Another point must be mentioned in regard to the issue of leasing and rental price. The majority's conviction that competitive bidding will be the cure needed to fix the assumed ill of land being leased at below fair market rates, rests on shaky ground. Only last year, in *Miller v. Corp. Comm.*, Okl., 635 P.2d 1006 (1981), a majority of this Court held the statutory sealed bid process for leasing oil and gas lands did not represent a sale in the open market and that

the bid process, by its very nature, is incompatible with an open market sale. The sealed bid process for oil and gas imposed on the Commissioners of the Land Office by 64 O.S.1971, § 281, is required by sec. 8 of the Enabling Act, cited by the majority here in support of its argument for competitive bidding to insure fair market value.

In *Miller*, the Court stated:

"The fair market value is one which can neither be inflated nor deflated by reference to special types of sales. The latter are not reflective of open-market conditions. * * *

"By its very nature the sealed-bid process is incompatible with an open market sale. Sealed bidding reflects the seller's unwillingness to bargain openly in, and yield to the forces of, the open market place. Confrontational interaction of the buyer with the seller is thus avoided. The value obtained for property sold by this process cannot be said to represent the very same price as that which the property would bring if it were sold under the usual and ordinary circumstances. This is so because the sealed-bid process obviously operates to alter those 'economic forces' at play which shape the fair market value. In short, the method by which the state is required by statute to exact a price for its leases is not *per se* co-incidental with the market process in action.

\* \* \* \* \* \*

"The statutorily mandated sealed-bid procedures for leasing state-owned minerals do not represent a sale in the open market. The price secured through that process though not *per se* indicative of fair market value, may nonetheless be of relevance when it is coupled with some showing that it is co-extensive or co-incidental with fair market value. The record before us does not demonstrate any *nexus* between the sealed-bid price and a fair market value." At 1008, 1009.

I also believe the majority has struck too broad a blow in its holding pertaining to the preferences for investment set forth in art. 11, sec. 6. They have rendered the provision nugatory.

The majority holds it is the Commissioners' responsibility to give the preferences in the "order in which they appear, as long as such preference does not prevent the State as Trustee from fulfilling its duty to obtain the maximum return" from the property.

This creates an impossible situation, for it is common knowledge that a greater return on those funds can be obtained by investing in high yield accounts than is possible from mortgage loans or school bonds.

I feel safe in assuming that this has always been true. I'm confident that at the time the Constitution was adopted, those items given preference were not the best "maximum return" investments available. They did, however, offer maximum security for the funds, and they still do.

The preferences of art. 11, sec. 6, implemented by 64 O.S.1971, § 51, do not benefit only farmers and ranchers. The trust benefits thereby, for there is probably no investment that is more secure than a first mortgage.

The trust property is protected even from the State itself. Liens securing the loans of the Commissioners have priority over tax liens. 68 O.S.1971, § 24346; See, *State, ex rel., Commr's of Land Office v. Passmore*, 189 Okl. 232, 115 P.2d 120; 136 ALR 324 (1941).

The people could have adopted a provision requiring the state to obtain the maximum possible return, but they did not. It is obvious that they intended to forego some return in favor of more secure investments, such as mortgages and school bonds, etc. The other relevant provisions of article 11, sections 1, 2, and 5, are clearly weighted in favor of safe and conservative financial management of these funds, consistent with the preferences dictated by art. 11, sec. 6. The security of the investment is of the first and highest importance. This balancing of interests is undone today.

While the majority is obviously correct that trustees have a duty to obtain a good return from the trust property, it is also true that trustees have a duty to act prudently and to make financially responsible decisions. Toward that goal, the State, its Legislature, and Commissioners are bound to follow their constitutional duty imposed by art. 11, sec. 6, and 64 O.S.1971, § 51. The majority makes that duty impossible.

Even conceding that the interest fixed in § 52(c) is, at this time, unconscionable and arbitrarily low, the harm done to the constitution today is of greater importance. The majority acts precipitously in its holding demanding maximum return which will, if followed, lead the Commissioners to ignore the clear demands of the constitution, art. 11, sec. 6, implemented by 64 O.S.1971, § 51.

I am authorized to state that DOOLIN and HARGRAVE, JJ., join in this dissenting opinion, and OPALA, J., concurs in part.